# Richmond

ALEXANDRIA WATER COMPANY V. CITY COUNCIL OF
ALEXANDRIA, INTERVENOR.

November 15, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and
Chinn, JJ.*

*Mr. Justice Browning was sick and did not sit when this case
was reargued, and has not participated in the decision of it. The
case was assigned to Mr. Justice Epes at the Wytheville term 1934
to prepare the opinion therein.

514

518

The opinion states the case.

*Gardner L. Boothe* and *Clarence H. Dickey,* for the appellant.

*Abram P. Staples, Attorney-General, Edwin H. Gibson, Assistant Attorney-General,* and *Albert V. Bryan* and *Carl Budwesky,* for the appellee.

*E. Randolph Williams, amicus curiae.*

EPES, J., delivered the opinion of the court.

The Alexandria Water Company (to which we shall hereafter refer as the company) is a public service corporation engaged exclusively in supplying water to the people in the city of Alexandria and in adjacent or near-by parts of Arlington and Fairfax counties.

On October 30, 1930, it filed its petition in the State Corporation Commission (hereafter referred to as the Commission) asking that it be permitted to put into effect as of February 1, 1931, the schedules of rates and charges therewith filed. Its rates then in effect were the rates prescribed by an order of the Commission entered August 21, 1918, authorizing the Company to put into effect the schedules of increased rates prescribed in that order.

In its petition it alleged that the present fair value of its properties used and useful[1] was in excess of $2,000,000; that its net operating income under its present rates for the year ending June 30, 1930, was $64,332.24, slightly more than three per centum upon the present fair value of its properties; that this was not a fair return, and that, therefore, its existing rates were confiscatory.

Its rates then in effect were the rates prescribed by an order of the Commission entered August 21, 1918, authorizing increased rates. The new schedules of rates filed February 1, 1931, were to all intents and purposes the existing schedules of rates *increased by forty per centum.*

The city council of Alexandria (hereinafter referred to as the City) intervened on behalf of the City and the public, opposed any increase in the rates of the Company, and filed a cross-complaint against the Company. In its cross-complaint it alleges that the present fair value of the Company's property used and useful was far less than $2,-

---

[1] Wherever we use the expression "used and useful" we mean owned by the Company and used and useful in the performance of its public service.

000,000; that it was not rendering adequate and proper service to its consumers (industrial and domestic); and that by its charter (Acts 1849-50, page 145) the duty was imposed upon it to provide an adequate supply of water for fire protection purposes free of cost to the city, and that it was not complying with this provision of its charter. It prayed that the Company's existing rates and charges be reduced until it should provide adequate water service, and that the Company be "either compelled to comply with all the conditions, duties and obligations imposed by its charter" or "else that the franchise rights of the said Company in the streets of said city be rescinded or cancelled and the said Company required to make application for a franchise in the city in the manner and upon the terms required by law, * * *, if it desires to reacquire the use of the streets."[2]

The Commission suspended the application of the proposed increased rates pending a hearing thereon, and set the case for hearing. The hearing was continued from time to time to afford the Company and the City full opportunity to present all evidence that either party desired. On January 30, 1932, the Commission, after full hearing and argument, entered its order, which, in so far as it is here material, reads as follows:

"The State Corporation Commission, upon consideration of this matter upon the merits and upon the whole record * * * and for the reasons stated, and upon the findings of fact set forth, in the opinion of the Commission, by Hooker, Chairman, which opinion is * * * made a part of the record

---

[2] In the order here appealed from the Commission makes no reference to the prayer of the City that the charter and/or local franchise of the Company granted in its charter (Acts 1849-50, p. 145) be revoked. But in its opinion the Commission properly disposes of this question saying that, even if the Company be guilty of having violated its charter, the Commission is without jurisdiction to revoke its charter, or the local franchise therein granted; and that the proper procedure in such a case is by writ of *quo warranto* in the circuit or corporation court in which the principal office of the corporation in this State is located. Acts 1924, p. 690, ch. 460, as amended by Acts 1928, pp. 632, 633, ch. 200; Michie's Code Va. 1930, sections 4073a, 4073d. See, also, *Ex parte Norfolk Ry. & L. Co.*, 142 Va. 323, 128 S. E. 602.

(is of opinion), that the present fair value, as of December 31, 1930, of the property of The Alexandria Water Company, used and useful in the performance of its public service functions, on which it is entitled to earn a return, is found and determined to be $1,150,000; that the net return upon this valuation under present rates, allowing for a proper and reasonable deduction for operating expenses, is approximately 5.3 per centum; that 5.3 per centum is not a fair and reasonable return; that, therefore, some increase in rates is necessary; that a horizontal increase of ten per centum of the rates in existence on December 31, 1930, would produce a return of approximately 6.4 per centum on the present fair valuation as hereby found; and that approximately 6.4 per centum is a fair return in view of all the facts and circumstances of this case;

"It is therefore ordered, that The Alexandria Water Company forthwith file, to be effective on and after February 1, 1932, a schedule of rates, to be charged for water * * * which will involve a horizontal increase of ten per centum of the rates which were in effect at the institution of this proceeding, on December 31, 1930, and on this date. * * *

"It is (further) ordered, that The Alexandria Water Company do proceed forthwith to clean its cast iron distribution system to an extent sufficient to enable it to render adequate and reasonable service to the public; that such cleaning of the system be pressed to as speedy a completion as is practically possible; that in all events the cleaning hereby ordered be completed before the first day of January, 1933, * * * (and) that the work hereby directed be subject to the order of the Commission from time to time as may be, or become, necessary or advisable, according to law; and, to such ends, that this matter be, and hereby is, continued generally upon the docket of the Commission."

When the opinion of the Commission had been filed, the City filed its petition asking that the Commission enter a further order deciding the issue "whether or not the Alexandria Water Company was required under its charter and franchise * * * to furnish the citizens and the city of Alex-

andria, free of cost, an adequate supply of water for fire protection."

The Company filed its petition asking that the Commission "set forth its finding of fact and the basis of its decision with such sufficiency of detail as will enable this petitioner to test the legality and reasonableness of the order of the Commission," and that to this end it file a supplementary finding of facts upon certain matters, particularly as to how it arrived at its estimates of accrued depreciation existing in the several items of the property of the Company, and how it arrived at its estimate of the amount which should properly be allowed as an expense item to create a reserve against which retirements and depreciation shall be charged. The Commission refused to comply with the prayers of either of these petitions.

On July 12, 1932, the Company filed its petition for an appeal from the orders of the Commission, before one of the justices of this court. The appeal was allowed, with bond in the penalty of $1,500, and with the provision that "the allowance of this appeal shall *not* operate as a *supersedeas* to the order of the State Corporation Commission appealed from."[3]

In its petition for an appeal the Company makes thirteen assignments of error. These assignments of error raise two major issues to which the other assignments of error are auxiliary. These are:

(A) The rates allowed and prescribed by the Commission are so low that the effect of the enforcement thereof will be to confiscate the property of the Company used and useful; and the order of the Commission, therefore, violates the due process clauses of section 11 of the Constitution of Virginia and of the Fourteenth Amendment of the Constitution of the United States.

---

[3] While it does not appear from the record, we understand from what was said at the bar of the court that upon the granting of the appeal without *supersedeas* the Company, having executed the $1,500 bond required, put into effect the ten per centum increased rates permitted and prescribed by the order of the Commission and has since been charging those rates.

(B) Even if the rates prescribed can be said to be non-confiscatory, they are not high enough to be just and reasonable rates, and the prescription of them constitutes an improper exercise by it of the legislative power and discretion vested in the Commission by the Constitution of Virginia and the statutes enacted in pursuance thereof.[4]

As auxiliary to these two major assignments of error, the Company alleges that the Commission erred in the following particulars:

(1) It erred in finding that the fair value as of December 30, 1930, of the Company's property used and useful, upon which it is entitled to earn a reasonable return, was only $1,150,000, and in not finding that it was "not less than $1,900,000." In this connection it makes the allegation that "in determining the value of your petitioner's property the Commission disregarded the evidence, and its finding as to the value of petitioner's property is without evidence to support it."

(2) In its method of finding the value of the Company's property, it erred in the following particulars:

(2a) It erred in the methods used by it to arrive at the value.

(2b) It erred in not giving due consideration to reproduction new cost of its physical properties less accrued depreciation, plus a reasonable allowance for "going concern value," and working capital.[5]

(2c) It erred in excluding from the inventory of property used and useful two parcels (or tracts) of land (*i. e.,* tract A containing 118 acres and tract B containing 146 acres) which are included in what is known as the Barcroft Reservoir tract of 949 acres; and in finding that these two tracts "are not necessary either for the protection against pollution, or for the maintenance of an adequate water

---

[4] This assignment of error is not clearly stated in the assignments of error, but it unmistakably appears from the treatment in the Company's brief of its more general assignment that the rates allowed by the Commission are not just and reasonable rates.

[5] No complaint is made of the Commission's allowance for working capital (including materials and supplies).

supply, and that the disposal of them will not seriously affect the quality of water ultimately delivered to the consumers of petitioner. * * * In excluding said land the Commission invaded the managerial discretion which reposes solely in the officers of the Company and those charged with its operation and management."

(2d) It erred in the deductions it made on account of "observed physical deterioration," and also "in making further deductions on account of 'unobserved physical deterioration, obsolescence, inadequacy, inappropriate engineering, etc.,'[6] which were improper and without support in the evidence."

(2e) In making its finding or estimate of reproduction new cost it erred in making too small allowances (or loadings) for general overheads. It should have added to the total estimated labor and material costs of reproducing new the physical properties (including land) of the Company fifteen per centum for general overhead expenses.

(2f) It erred in not including in its value of the Company's property an item of $150,000 for going concern value, and in allowing only $60,000 for this item.

(3) In computing or estimating the net operating income of the Company the Commission committed the following errors:[7]

(3a) It held that, in view of the management services, etc., received under the management control contract the Company has with the American Water Works and Electric Company, the office salary expense could and should be reduced by $4,500 a year, and excluded that amount from the

---

[6] In its brief counsel for appellant has this to say on this subject:

"In view of the general language used by the Commission in determining the accrued depreciation, and in further view of the action of the Commission in refusing to elaborate upon their findings as to accrued depreciation, we believe that it is proper, at this time, for this court, *acting as a legislative body, and having the jurisdiction so to do*, to entirely ignore the findings of the Commission as to accrued depreciation, as being too vague and not complying with the Constitution of the State of Virginia; and upon such a finding to substitute its judgment for that of the Commission in ascertaining the value of the property * * *." (Italics ours.)

[7] With these two exceptions the Company does not complain of the Commission's estimates of and allowances for its annual expenses.

Company's estimate of its annual operating expense. The office salary expense actually being incurred is salary of superintendent $6,000 a year, salary of cashier $3,500 a year, salaries of two clerks at $141.66 and $100 a month, and of one clerk at $15 a week. No part of this salary expense should have been disallowed.

(3b) If the Commission's finding as to accrued depreciation in connection with its finding of the value of the Company be correct, it erred in not allowing more than $14,000 per annum as an expense item for depreciation and retirement expense.

(4) The Commission erred in holding that 6.4 per centum is a "fair and reasonable" rate of return to be allowed the Company, and should have held that the Company was entitled to receive a return "in excess of seven per centum" on "the full value of its property," and have approved the schedule of rates filed by the Company. The contention here seems to be a double header, presenting both of these phases:

(4a) A return of less than seven per centum on the value of a property such as this is so low as to amount to a confiscation of the Company's property.

(4b) Even if a return of 6.4 per centum be not confiscatory, as a legislative policy, the Commission should have allowed or prescribed a rate which will yield a return in excess of seven per centum.

(5) The Commission erred in holding that "the service rendered by the petitioner in Alexandria is not as satisfactory and efficient as the customers are reasonably entitled to, and in giving effect to this erroneous holding in finding the value of petitioner's property and in prescribing rates to be charged for future service." ·

(6) The Commission erred in not complying with the Company's request that it make and file "supplementary findings of fact upon accrued depreciation and upon depreciation or retirement expense."[8]

---

[8] This is the only error in procedure alleged by the Company. While it would have been helpful to the court had the Commission given

Upon the appeal being granted (as of course), the City came in and filed assignments of cross-error as follows:

The Commission erred in granting the Company any increase in rates, and should have reduced its existing rates so that they would not yield in excess of five per centum on the value of its property for the following reasons:

(1) The facilities of the Company are in such a deplorable condition, the quantity of the water supplied both for customer use and fire protection purposes is so insufficient and inadequate and the quality of water supplied is so poor, that the existing rates constitute charges in excess of the value of the services rendered.

(2) The country wide depression warrants and requires rates lower than the existing rates, and that public utilities receive and accept a lower rate of return than that allowed by the Commission.

(3) The Commission has allowed the Company to include in its operating expenses, and thus charged against the consumers, an amount for furnishing water to the city for fire protection (inadequate as such supply is), though the charter of the Company requires it to furnish water to the city for fire protection "free of any fee, charge or demand whatsoever." (Acts 1849-50, pp. 145-6.)

(4) The Commission should not have allowed the Company as an expense item in excess of $10,948.04 for an annual charge for depreciation.

(5) The Commission should not have allowed the Company an annual expense item of $8,300 for cleaning its pipes. When it was granted an increase of rates in 1918, it was ordered by the Commission to clean its pipes, and

more detail as to its findings on these points, the statement made by the Commission in its opinion is not as a matter of law an insufficient compliance with the provision of the Constitution (section 156f) that the Commission "shall certify to the appellate court all the facts upon which the action appealed from was based"; and we shall not notice this assignment of error. The situation here presented is very different from that with which the court was dealing in *Petersburg Gas Co.* v. *Petersburg*, 132 Va. 82, 110 S. E. 533, 20 A. L. R. 542; *Appalachian Power Co.* v. *Com.*, 132 Va. 1, 110 S. E. 360. However, had the Commission given a fuller statement upon these points it would have greatly reduced the labors of the court.

the cost of cleaning its pipes was taken into consideration as an expense item in fixing its rates. It has not obeyed the order of the Commission; and the annual allowance now made by the Commission for cleaning mains, in effect, permits the Company to charge against future rate payers deferred maintenance, which has accrued due to the fact that it has paid out in dividends the amounts which it had been permitted to collect from past rate payers to cover the cost of such maintenance, *i. e.*, cleaning the mains. We shall not notice this last assignment of cross-error further than to say that in our opinion it is not well made.

After this case had been argued upon appeal, the court handed down its opinion in *Aetna Ins. Co.* v. *Com.*, 160 Va. 698, 169 S. E. 859 (commonly referred to as the fire insurance rate case). One of the questions presented in that case was, whether or not, in reviewing upon appeal an action of the Commission prescribing fire insurance rates, the jurisdiction of this court was limited to the making of a purely judicial review of the order of the Commission. The court held that its jurisdiction was so limited. A short while before the *Aetna Case* was decided, the Corporation Commission entered an order in a case (its docket No. 4395) prescribing rates, for the Rosslyn Gas Company (a public utility company) which the Company regarded as confiscatory. Taking the view that in the *Aetna Insurance Company Case* the court had held that the Constitution of Virginia neither gave, nor empowered the General Assembly to give, to the Supreme Court of Appeals of Virginia any power or authority to exercise any legislative function upon an appeal from an order of the Commission involving the rates of a public utility company, and that, therefore, legislation was finally ended,[9] the Rosslyn Gas Company, without resorting to an appeal to this court, forthwith filed its bill in the district court of the United States for the Eastern District of Virginia, praying that the Commission

---

[9] See *Prentis* v. *A. C. L. Co.*, 211 U. S. 210, 53 L. Ed. 150, 29 S. Ct. 67.

be enjoined from enforcing its order, on the ground that the rates prescribed were confiscatory.

The Commission appeared and moved the court to dismiss the bill on the ground that in considering an appeal from an order of the Commission prescribing rates for a public utility company, the Supreme Court of Appeals acted in part legislatively, and that legislation not having been completed, the United States District Court was without jurisdiction.

Upon a hearing by a three judge court of the motion to dismiss, the court overruled the motion and handed down a written opinion (*Rosslyn Gas Co.* v. *Fletcher* [D. C.] 5 F. Supp. 25), in which it stated its reasons for so doing. In its opinion it took the view that in the *Aetna Insurance Company Case, supra,* this court had decided that upon an appeal from an order of the Commission prescribing public utility rates the court has and exercises no legislative functions, and that in such matters legislation becomes complete with the entry of an order by the Commission.

Up to this time neither the Commonwealth nor the State Corporation Commission had appeared in the appeal now before us. But a short time after the opinion of the Federal court in the *Rosslyn Gas Company Case* was handed down, the Attorney-General of Virginia filed a petition in the name of the Commonwealth and of the State Corporation Commission, in which they, in effect, asked to be admitted as parties to this appeal. After setting out the above stated facts with reference to the suit which had been instituted by the Rosslyn Gas Company, this petition concludes:

"Wherefore your petitioners pray that a reargument of the instant case may be allowed upon the question of the nature of the function of this court upon an appeal of this character, and in particular upon the instant appeal and of the right and duty of this court to consider the legislative questions presented in this appeal, and that your petitioners may be allowed to file a brief * * * in support of their allegation that in this appeal, and in all appeals of a similar character, this court is permitted to consider legis-

lative questions, and in proper cases to act legislatively, if need be."

The court granted the prayer of this petition, and set the case for reargument. When this was done Mr. E. Randolph Williams[10] came in and asked leave to file a brief as *amicus curiae*. The court granted him·permission to do so, and he filed an able brief in support of these propositions: The Constitution of Virginia has not given to this court, or authorized the legislature to give to it, the power and authority to exercise legislative powers upon an appeal from an order of the State Corporation Commission fixing rates for a public utility.

The position of the Company and the City upon the reargument was that they were both willing for this court to proceed to a final determination of *all* questions and issues raised by this appeal, regardless of what may or may not be the power or jurisdiction of this court to exercise

---

[10] Mr. Williams has been leading counsel in this court for the insurance companies in *Aetna Ins. Co.* v. *Com., supra.* In that case he had maintained the opposite point of view. His position then was that this court is empowered by section 156 of the Constitution of Virginia to exercise legislative powers when considering an appeal from an order of the State Corporation Commission prescribing rates for *any* company for which the Constitution empowers it, or authorizes the General Assembly to empower it, to prescribe rates; that being given the power to exercise legislative powers upon such an appeal, its review upon such an appeal cannot be a judicial review and is a legislative review; that this being true not only is there no judicial review of the orders of the Commission prescribing rates provided by the Constitution or statutes of Virginia, but the Constitution prohibits any provision for a judicial review thereof being made; and that, therefore, the act· of 1928 (Acts 1928, p. 1115, ch. 433; Michie's Code, Va. 1930, sections 4314(1)-4314(17)) and all orders of the Commission made in pursuance thereof are null and void, because the provisions of the Constitution and statutes of Virginia on this subject violate the due process clause of the Fourteenth Amendment of the Constitution of the United States, which requires that the State provide for an exclusively judicial review of the orders of such a Commission prescribing rates for a company, whether it be a transmission or transportation company, or some other public service company, or an insurance company.

In the *Aetna Ins. Co. Case, supra,* to meet this contention of the companies, counsel for the Commonwealth, among other arguments, advanced the argument that the Constitution of Virginia did not empower this court, or authorize the General Assembly to empower it, to exercise any legislative power upon a review upon appeal of an order of the Commission prescribing rates for any company other than for a transportation or transmission company.

legislative powers upon an appeal such as this. But it is axiomatic that consent cannot confer potential[11] jurisdiction, and we cannot thus easily sidestep these questions.

■■ Upon a consideration of the questions raised by the petition filed by the Commonwealth and the State Corporation Commission the court is of the following opinions:

(1) It was directly and pointedly held in *Aetna Ins. Co. v. Com.*, 160 Va. 698, 168 S. E. 859, that, except in transmission and transportation company cases, the Constitution of Virginia does not either expressly or impliedly empower or permit this court to exercise any legislative power or function upon an appeal from an order of the Commission, or empower the General Assembly to confer upon it the power to do so; and that upon an appeal from an order of the Commission this court, except in transportation and transmission company cases, is limited by the Constitution to a judicial review of the Commission's order.[12]

(2) Though a strong argument may be made for a view contrary to that taken in the *Aetna Case,* it should apply the principle of *stare decisis* and adhere to the decision in that case.

(3) We did not intend to hold in the *Aetna Case* nor do we intimate in this case that, had the Constitution given, or authorized the General Assembly to give this court the same powers in other cases that the Constitution gives it in transportation and transmission company cases, the provisions of the Constitution or statutes giving this court such power would be void under the Constitution of the United States or render void the provisions of the Virginia Constitution or statutes relating to rate regulation.[13]

---

[11] On distinction between potential and actual jurisdiction see *Iron City Bank* v. *Isaacsen,* 158 Va. 609, 164 S. E. 520.

[12] Except for the decision to the contrary in the *Aetna Case,* the writer would be of opinion that the Constitution of Virginia, at least impliedly, empowers the General Assembly to give this court the same powers in other cases that the Constitution by self-operative provisions gives it in the case of transportation and transmission companies.

[13] Section 156 (g) provides, "Whenever the court, upon appeal, shall reverse an order of the Commission affecting the rates, charges or the classification of traffic of any transportation or transmission com-

██ It is too well settled to require citation of authority that, while a commission (such as the State Corporation Commission of Virginia) is empowered to act in prescribing rates only within the limits imposed by the Constitution of the United States upon a State legislature and within such other constitutional and statutory limits as may be imposed by the State of its creation, and is required in prescribing rates to proceed according to certain rules of procedure which commonly pertain to judicial procedure, yet its action in prescribing rates for future application is the exercise of a legislative power. This would also seem

pany, it shall, at the same time, substitute therefor such order as in its opinion the Commission should have made at the time of entering the order appealed from, otherwise the reversal shall not be valid. Such substituted order shall have the same force and effect (and none other) as if it had been entered by the Commission at the time the original order appealed from was entered."

In only two cases involving the rates of a transportation or transmission company has this court reversed the order of the Commission. In both of them it acted upon the mandate of this section: *Com.* v. *Staunton Mutual Tel. Co.*, 134 Va. 291, 114 S. E. 600, and *Atlantic C. L. R. Co.* v. *Com.*, 145 Va. 62, 133 S. E. 883, 888. In the first named case the court disapproved in part the rate prescribed by the Commission, and prescribed a modified rate. In the second the court reversed the order of the Commission requiring the railroad companies in Virginia to cease charging on intrastate transportation the Pullman surcharge they were exacting. But it did not stop there. It further provided in its order that "the carriers are hereby authorized to collect the same Pullman surcharges intrastate as they are now collecting on interstate transportation in Virginia."

In the following cases involving rates of transportation or transmission companies the order of the Commission was affirmed: *Norfolk & P. Belt L. Ry. Co.* v. *Com.*, 103 Va. 289, 49 S. E. 39; *Com.* v. *A. C. L. Ry. Co.*, 106 Va. 61, 55 S. E. 572, 7 L. R. A. (N. S.) 1086, 117 Am. St. Rep. 983, 9 Ann. Cas. 1124; *Washington So. Ry. Co.* v. *Com.*, 112 Va. 515, 71 S. E. 539; *Com.* v. *Richmond Ry. Co.*, 115 Va. 756, 80 S. E. 796; *Richmond* v. *Va. Ry. & P. Co.*, 141 Va. 69, 126 S. E. 353; *Chesapeake & P. Tel. Co.* v. *Com.*, 147 Va. 43, 136 S. E. 575; *Dyer* v. *Va. R. & P. Co.*, 147 Va. 98, 136 S. E. 499; *Mathieson Alk. Works* v. *N. & W. Ry. Co.*, 147 Va. 426, 137 S. E. 608; *Norfolk & W. Ry. Co.* v. *Com.*, 162 Va. 314, 174 S. E. 85. If the provisions of the Virginia Constitution relating to the regulation of rates of transportation and transmission companies are void under the Constitution of the United States, these cases and the case of *Prentis* v. *A. C. L. Co.*, 211 U. S. 210, 53 L. Ed. 150, 29 S. Ct. 67, were all wrongly decided.

to be true where the Commission is empowered to condemn[14] as unreasonable and unjust rates which have been applied, unless its power to condemn a rate which has been applied be limited to the condemnation of a rate so high or so low or so discriminating that it would have been beyond its constitutional or statutory power to have prescribed it as a maximum or minimum rate for future use at the time it was charged.

■ When this court is called upon to review upon appeal an order of the Commission prescribing rates for any company, it is reviewing a legislative action; and its review is a *true* review; that is, it is not a review in either an independent direct attack or a collateral attack upon the order.

■ In a true review of an order of a commission pre-

[14] The Virginia State Corporation Commission has no power to make a retroactive condemnation of a rate of a transportation or transmission company or of any other company. Const. Va. section 156(g); *Mathieson Alkali Works* v. *N. & W. Ry. Co.*, 147 Va. 426, 137 S. E. 608, 609.

Section 13, par. 1, and section 16, par. 1, of the Interstate Commerce Act (U. S. C. A., Title 49, section 13(1) and section 16(1)) empowers the Interstate Commerce Commission to condemn as having been unjust and unreasonable a rate which has been charged by a carrier notwithstanding it had been authorized by the Commission, and to award reparation to the shipper for the difference between the rate charged and the rate which the Commission determines would have been a just and reasonable rate.

In such cases the Commission, in condemning the rate charged as unreasonable and unjust, is exercising either an administrative or a legislative power, and not a judicial power.

The Supreme Court of the United States does not seem to have reached a clearly fixed determination as to whether the Commission is exercising an administrative or a legislative power. Sometimes it begs the question by calling it *"quasi-judicial"* as in *Baer Bros. Merc. Co.* v. *Denver & R. G. R. Co.*, 233 U. S. 479, 58 L. Ed. 1055, 34 S. Ct. 641. But it seems to be clear and consistent in its holding that it is not a judicial power. See, on this subject, cases cited in notes to U. S. C. A., Title 49, section 16(1). In his note to that section at p. 11, the annotator seems to be of opinion that the action of the Commission in condemning the past rate is administrative. He says: "Usually the claims for which reparation is awarded constitute claims involving the reasonableness or discriminatory character of rules or regulations contained in the tariff schedules filed with the Interstate Commerce Commission and which involve questions left to the *administrative powers* of the Commission over which the Commission had exclusive initial jurisdiction, such claims not being enforceable in the first instance in the courts by an action for damages until the *administrative question* has been determined by the Commission." (Italics ours.)

scribing rates or taking other legislative or administrative action, the review conceivably may be:[15]

(A) to try the trial or proceedings had before the Commission, that is, to pass upon

    (1) the jurisdiction of the Commission, as determined by

        (x) the law (*i. e.*, the Constitution and statutes) and/or
        (y) the jurisdictional facts,

    (2) the regularity and/or adequacy of the procedure, as determined by

        (x) constitutional provisions,
        (y) statutory provisions,
        (z) self-imposed rules of the Commission,

    (3) the good faith of the Commission, involving at times the question whether the Commission has acted arbitrarily and/or without *any* substantial evidence to support its conclusions or action;

(B) to reconsider the Commission's conclusions

        (x) of law and/or
        (y) of fact upon which its conclusions of law are based or to which they are applied;

(C) to reach a conclusion of law, or of fact upon which a conclusion of law is based or to which it is applied, where a Commission has failed to do so or has reached a wrong conclusion;

(D) to reconsider the conclusions of the Commission as to the legislative or administrative policy to be applied in the premises and/or its findings as to the facts upon which it predicated its determination of the legislative or administrative policy.

A *purely* judicial review comprises a review of the points included under A-C above,[16] and excludes any

---

[15] In giving this analysis of the conceivable points of rehearing upon a true review of a legislative or administrative action, we acknowledge our indebtedness to Prof. Nathan Isaacs of the University of Pittsburgh Law School, for the analysis made by him in his article on "Judicial Review of Administrative Findings," published in June, 1921, in 30 Yale L. J., pp. 781, 785.

[16] Statements as to the scope of a review by a court of an order of a commission, *where the Constitution has not authorized the court, or empowered the legislature to authorize it to exercise legislative or administrative powers on such a review* are found in *Interstate Commerce Commission* v. *Ill. Cent. Ry. Co.*, 215 U. S. 452, 54 L. Ed. 280, 30 S. Ct. 155, 160, and *Louisville & N. R. Co.* v. *Garrett* (1913), 231 U. S. 298, 313, 58 L. Ed. 229, 34 S. Ct. 48, 54. See, also, *Skinner & Eddy Corp.* v. *U. S.*, 249 U. S. 557, 63 L. Ed. 772, 39 S. Ct. 375.

In *Interstate Commerce Commission* v. *Ill. Cent. R. Co.* (a case involving rules and regulations for the distribution of coal cars) the court, speaking through Mr. Justice White, says:

"The statute endowing the [Interstate Commerce] Commission with

review of the matter mentioned in D; and upon a purely judicial review, a review of findings of fact is purely incidental to its power to decide the questions of law presented. For instance, in a rate case a court, if limited to a purely judicial review, has no power to review the Commission's finding as to the value of the property in question, except in so far as it may be necessary to determine the ultimate question of whether the Commission has exceeded its powers in prescribing the rates prescribed by it.

Accepting the scope of our power to review the order of the Commission as being limited to a purely judicial review as above defined, we now turn to a consideration of the questions raised by the appellant and appellee in their assignments of error, and shall take up first the Company's contention (2e) that the Commission erred in excluding tracts A and B of the Barcroft land from the property on which the Company is entitled to receive a return from rates charged its customers.

The Company's chief, practically its only used, sources of water supply are Holmes' run and Cameron run. Holmes' run has a water shed of 18.8 square miles, of which 14.3 square miles is above the point at which the Barcroft dam has been built. Cameron run drains what is known as

large administrative functions, and generally giving effect to its orders concerning complaints before it without exacting that they be previously submitted to judicial authority for sanction, it becomes necessary to determine the extent of the powers which courts may exert on the subject.

"Beyond controversy, in determining whether an order of the Commission shall be suspended or set aside, we must consider,

"*a*, all relevant questions of constitutional power or right;

"*b*, all pertinent questions as to whether the administrative order is within the scope of the delegated authority under which it purports to have been made; and

"*c*, * * * whether, even although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable manner as to cause it, in truth, to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power." (Separate paragraphing of a-c ours.)

"* * * such perennial powers lend no support whatever to the proposition that we may, under the guise of exerting judicial power,

the Back Lick water shed, which has an area of 14.7 square miles above its junction with Holmes' run. Just below the junction of these two runs, there is a diversion dam, which diverts their combined flow into a ditch or race about 9,000 feet long, which conducts it to the Cameron pumping station. This has been the arrangement since about 1852.

Not until 1915 did it have an impounding reservoir. But in 1903 it began to acquire the land and water rights for the construction of what is now known as the Barcroft reservoir on Holmes' run, a short distance below the confluence of its Middle and North forks. During the period 1903-1912 it acquired various parcels of land, making a tract of 949.37 acres on the Holmes' run water shed. All but two small parcels were acquired during the period 1903-1906. This is all the land now owned by the Company on the Holmes' run water shed. The aggregate purchase price of this land was between $60,000 and $65,000.

In 1913 it began the construction of an impounding dam across Holmes' run at the point above indicated and completed it in 1915. This dam (known as the Barcroft dam) creates a reservoir, having a surface area of about 117 acres, a shore line of about seven miles, and impounds something more than 617,000,000 gallons of water.

usurp administrative functions by setting aside a lawful administrative order upon our conception as to whether the administrative power has been wisely exercised. Power to make the order and not the mere expediency or wisdom of having made it, is the question." (Paragraph arrangement to some extent ours.)

In this case the court sidesteps passing upon whether the court could substitute an order it considered proper for one promulgated by the Commission which it deemed improper. But see 5 Elliott on Railroads (3d Ed.) p. 414, citing a long list of cases to the effect that the power of the courts to compel obedience to the lawful order of the Interstate Commerce Commission is purely statutory, and that the courts cannot modify or amend the orders of the Commission, but must either refuse to compel obedience to the Commission's order or unqualifiedly compel obedience.

In *Louisville & N. R. Co.* v. *Garrett, supra* (a rate case), the court speaking through Mr. Justice Hughes, says:

"It may be assumed that the statute of Kentucky forbade arbitrary action; it required a hearing, the consideration of the relevant statements, evidence and arguments submitted, and a determination by the Commission whether the existing rates were excessive. But, on these conditions being fulfilled, the questions of fact which might

The water flowing from this dam runs through Holmes' run, Cameron run and the Cameron race to the Cameron pumping station, a total distance of about four miles. For at least three and one-half miles of this distance the Company owns no land protecting the flow against contamination. When it enters Cameron run it mixes with the water from the Back Lick water shed, upon which the Company owns no land. Omitting the area actually covered by the impounded water, the Company owns only a small fraction more than nine per centum of the area of the water shed which drains into the Barcroft dam reservoir; and on the Holmes' run water shed (several miles above the land owned by the Company) there is a suburban development of some size known as Falls Church.

Prior to 1919 the water delivered to consumers was not filtered. In 1919 the Company constructed an efficient filtering plant, and the water is now pumped through iron mains from the Cameron run pump station to the filter plant, and passes through it before it is delivered to the distributing reservoirs.

Included in the 949.37 acres above mentioned are two tracts designated by the Commission as tract A and tract B. Tract A contains 118 acres. It lies northeast of the reservoir and fronts on the Leesburg pike for about 2,250 feet, from which it runs back for depths varying from about 1,683 feet to 2,297.5. Its front on the pike at its nearest point is about 2,900 feet from the water line of the reservoir, and the rear (south line) at its nearest point is about 800 feet from the water line. Tract B contains 146 acres. It lies south or southwest of the reservoir and fronts on the Columbia pike for approximately 3,000 feet. One

arise as to the reasonableness of the existing rates in the consideration preliminary to legislative action would not become as such judicial questions to be reexamined by the courts. The appropriate question for the court would be whether the Commission acted within the authority duly conferred by the legislature, and also so far as the amount of compensation permitted by the prescribed rates is concerned, whether the Commission went beyond the domain of the States' legislative powers and violated the constitutional rights of property by imposing confiscatory requirements."

of its lines (which runs approximately northwest and southeast) is about 5,300 feet long, and roughly parallels the water line of the reservoir at distances therefrom varying from about 400 to about 1,000 feet. The opposite line (which runs for most of its length along an unnamed roadway) roughly parallels the water line of the reservoir at distances of from 1,925 to 3,000 feet therefrom. The natural drainage from all, or practically all, of both tracts is into the reservoir.

The witnesses for both the Company and the City testified that both tracts are well suited to subdivision into suburban residential lots, and that this fact makes them among the most valuable parts of the whole reservoir tract. However, there has been no extensive building upon the properties not owned by the Company which are adjacent to or near these tracts.

The sanitary engineer of the American Water Works and Electric Company (which owns all the stock of the Alexandria Water Company) testified that these two tracts were very useful and necessary for the protection of the purity of the water supply; that were either of them to be developed for residential purposes to any considerable extent, it would seriously pollute the water supplied, make it of a less high grade for domestic purposes, and be a menace to the health of the consumers; that the passage of the water through the filter plant would not entirely remove the pollution or eliminate the danger therefrom; and that, if the Company did not now own these tracts, it should acquire them. But on cross-examination he admitted that at Hopewell, Virginia (where the water plant is owned and operated by the American Water Works and Electric Company), the source of supply is the Appomattox river, into which the city of Petersburg empties its sewage some fifteen or twenty miles above the intake of the Hopewell supply; that notwithstanding this, by filtration and treatment a very fine grade of water is supplied the Hopewell consumers; and that the filtration facilities at Alexandria are modern and in a general way very similar to those at Hopewell.

The City introduced Allen J. Saville, an experienced public utility engineer, who was for several years the director of public works for the city of Richmond. He testified, in effect, that modern purification and filtration plants are taking care of pollution in impounded water supplies generally; that with such facilities at Alexandria the possible building up of tracts A and B would make very little difference in the grade or safety of the water supply; and that in view of the fact that a good part of the village of Falls Church and other built-up areas drain into the reservoir and the water after it leaves the dam is mixed with that from another large and wholly unprotected water shed, there was little reason and no necessity for holding these two tracts as a protection against pollution.

Further, as pointed out by the Commission in its opinion, it is a matter of common knowledge that many large cities obtain their water supply from streams into which higher up the sewage of other cities, towns, and villages has been discharged, purifying and making it potable by filtration and purification treatments; and that the water supplied in these cities is potable, pleasant to the taste, is used with safety by the inhabitants, and considered safe by health officials and sanitary experts.

Clearly it cannot be said that there is *no* substantial evidence which supports the decision of the Commission on this point. Nor are we able to say upon an independent examination and consideration of all the evidence bearing upon the point that, *as a matter of law,* the Commission has gone in this particular beyond the limits of its jurisdiction, or transcended the limits of the legislative (or administrative) discretion vested in it by the Constitution and statutes of Virginia, or acted arbitrarily, or acted in bad faith, or has been guilty of an illegal interference with the managerial discretion of the affairs of the Company.

The order of the Commission, in effect, relieves the Company of any public duty to hold or use these tracts for public service purposes, and leaves it free to put them to any use it may see fit, including that use the potentiality of

which is the element which gives to them a very large part of their value. Under the circumstances the refusal of the Commission to permit the Company to charge rates which enable the Company to earn a fair return on the fair value of all its other property used and useful and also upon this property cannot be a confiscation of these tracts, unless and until some tribunal, having the power to review the exercise by the Commission (within the limits of its jurisdiction) of its legislative or administrative discretion, shall have reversed and annulled its decision that these tracts are not properly to be considered useful for the Company's public service functions.

In any *purely* judicial review of the order here appealed from by a court having no power to review the exercise by the Commission (within the limits of its jurisdiction) of the legislative or administrative power and discretion vested in it, the action of the Commission in excluding these two tracts from the inventory of property used and useful must, we think, be sustained.

Our next inquiry has to do with the Commission's estimate of the cost to reproduce new the Company's property used and useful.

The Company introduced in evidence an estimate, made by its witnesses Milholland and Biggs, of (a) reproduction new cost less depreciation as of March 1, 1930, plus (b) net additions and betterments to property from March 1st to December 31, 1930, plus (c) materials and supplies, preliminary and organization expense and "going value."

The City introduced similar estimates made by its witnesses Williamson and Saville. The evidence shows that the work of these two gentlemen was done in collaboration, and that the estimate introduced by Saville in his testimony was prepared after he had had an opportunity to examine the evidence introduced by the Company and make any adjustments he might deem proper in the light of that evidence.

In preparing their estimates of reproduction new cost less depreciation of physical property other than land, the

witnesses for the Company and for the City have applied all their percentage additions for overheads to their estimates of cost of labor and material to reproduce new, and their percentage deductions for depreciation to their estimates of labor and material cost *plus* additions for overheads. In dealing with lands and rights of way the Company's witnesses have applied all their percentage additions for overheads to the present value of land.

The Commission has pursued a somewhat different course in dealing with allowances for overheads and making deduction for depreciation. This makes it necessary for purposes of comparison to apply the Commission's allowances for overheads and deductions for depreciation to the bases used by the witnesses.

In Table I is given the Commission's statement of its estimate of reproduction new cost less depreciation of the physical properties of the Company used and useful.

In Table II is given a comparative statement of (1) Milholland's and Biggs', (2) Williamson's, (3) Saville's, and (4) the Commission's (a) reproduction new cost less depreciation as of March 1, 1930, plus (b) net additions and betterments to property from March 1st to December 31, 1930, plus (c) materials and supplies, preliminary and organization expense, and going value. While the amounts shown in this table for the Commission's overhead allowances (line 4) and for its depreciation (line 7) differ from the figures shown in the Commission's computation given in Table I, those shown in this table are the amounts which the Commission in fact used. The apparent difference is due to the Commission's having depreciated the cost of labor and material and then adding overhead allowances to the depreciated labor and material cost. The result obtained is the same, but for comparison of what the Commission has done with the testimony of the witnesses, it is necessary to state their actions in the same terms.

The claim of the Company is that the present fair value of its property used and useful is its estimate of reproduction new cost less depreciation, plus net additions and bet-

terments, plus its estimates of working capital, material and supplies, preliminary and organization expense, and "going value," which total $1,959,376. See line 20, column 1, Table II.

In Table III we give in columns 1, 2, 3 and 4 the Company's division into groups of its physical properties, other than land, and its estimates of reproduction new cost less depreciation, and in columns 5, 6, 7 and 8 the Company's, Williamson's, Saville's and the Commission's estimates of the depreciation existing in each group stated in percentages of the cost of reproduction new.

TABLE I

1. Total physical property, less land and rights of way, as stipulated—March 1, 1930...................$ 1,300,000
2. Deduct Commission's estimate of accrued depreciation, due to all causes, @ 24.7 per centum............. 321,100

3. Subtotal (1 less 2) .......................$ 978,900
4. Add Commission's value for land and rights of way.. 137,496

5. Subtotal (3 plus 4) .....................$ 1,116,396
6. Omissions and contingencies—Commission's two per centum on (5 less 4) $978,900.................... 19,578
7. Engineering and supervision—Commission's 4.8 per centum on (5 plus 6) $1,135,974.................. 54,527
8. Administrative, legal, preliminary and organization's expenses—Commission's 1.5 per centum on (5 plus 6 plus 7) $1,190,501 ............................ 17,858

9. Subtotal (5 to 8, inclusive)................$ 1,208,359
10. Interest during construction—Commission's five per centum on total line 9.......................... 60,418

11. Total—March 1, 1930.....................$ 1,268,777
12. Net additions—March 1, 1930, to December 31, 1930.. 51,860

13. Commission's approximate present value of physical property, used and useful, as of December 31, 1930, as derived from reproduction new costs..........$ 1,320,637

### TABLE II

Comparative estimates of (a) reproduction new cost and (b) reproduction new cost less depreciations, plus (c) material and supplies, working capital, preliminary and organization expense, and going value.

| | 1. Company's estimate | 2. Williamson's estimate | 3. Saville's estimate | 4. Commission's estimate |
|---|---|---|---|---|
| 1. Labor and material cost to reproduce new physical property, excluding land.. | $1,364,220 | $1,266,614 | $1,266,614 | $1,300,000 |
| 2. Add or deduct according to stipulation...................... | —64,220 | +33,386 | +33,386 | 0 |
| 3. (1 plus or minus 2)................ | $1,300,000 | $1,300,000 | $1,300,000 | $1,300,000 |
| 4. Add for general overhead.. | 195,000 | 130,000 | 130,000 | 180,830 |
| 5. (Per cent 4 of 3).................... | (15%) | (10%) | (10%) | (13.91%) |
| 6. Total reproduction new cost of physical plant excluding land (3 plus 4)....... | $1,495,000 | $1,430,000 | $1,430,000 | $1,480,830 |
| 7. Deduct for accrued depreciation................................. | 128,023 | 479,638 | 445,423 | 365,746 |
| 8. (Per cent 7 of 6).................... | (8.57%) | (33.54%) | (31.15%) | (24.7–%) |
| 9. Reproduction new cost less depreciation of physical property, excluding land. (6 minus 7)....... | $1,366,977 | $ 950,362 | $ 984,577 | $1,115,084 |
| 10. Appraised present value of land used and useful...... | 321,686 | 87,767 | 93,053 | 137,496 |
| 11. Add to appraised value of land for general overheads...................................... | 48,253 | 0 | 0 | 16,197 |
| 12. (Per cent 11 to 10)............... | (15%) | .................... | .................... | (11.78%) |
| 13. Total reproduction new cost less depreciation of physical property inventoried as of 3/1/30 (9 plus 10, plus 11).................. | $1,736,916 | $1,038,129 | $1,077,630 | $1,268,777 |
| 14. Add net additions and betterments 3/1 to 12/31/30.. | 51,860 | 51,860 | 51,860 | 51,860 |
| 15. Total reproduction new cost less depreciation of physical property as of 12/31/30 (13 plus 14)........ | $1,788,776 | $1,089,989 | $1,129,490 | $1,320,637 |
| 16. Materials and supplies.......... | 1,140 | 1,500 | 1,500 | 1,500 |
| 17. Working capital...................... | 460 | 2,500 | 2,500 | 500 |
| 18. Preliminary and organization expense......................... | 19,000 | 0 | 0 | 0 |
| 19. Going value............................ | 150,000 | 50,000 | 50,000 | 60,000 |
| 20. Total....................................... | $1,959,376 | $1,143,989 | $1,185,490 | $1,382,637 |

TABLE III

Accrued Depreciation

| Group | 1. General description of property in group | 2. Company's reproduction new cost exclusive of overheads | 3. Company's depreciation | 4. Company's reproduction new cost less depreciation | Depreciation stated in percentages of reproduction new cost including overheads | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 5. Biggs' | 6. Williamson's | 7. Saville's | 8. Commission's |
| B | Source of supply | $ 478,131 | $ 7,038 | $ 471,093 | 1.47 | 23.4 | 18.3 | 16 |
| C | Buildings | 56,945 | 14,351 | 42,594 | 25.20 | 60.6 | 51.2 | 36 |
| D | Pumping machinery | 55,439 | 14,281 | 41,158 | 25.75 | 69.3 | 69.6 | 47 |
| E | Purification | 42,511 | 6,380 | 36,131 | 15 | 60 | 56 | 35 |
| F | Distribution system | 723,732 | 70,841 | 652,891 | 9.79 | 33.7 | 33.7 | 27 |
| G | General equipment | 7,462 | 3,941 | 3,521 | 52.80* | 22.3 | 22.3 | 50 |
| | | $ 1,364,220 | $ 116,832 | $ 1,247,388 | 8.57 | 33.5 | 31.1 | 24.7 |
| | Deduct to adjust in accordance with stipulation | 64,220 | 5,504† | 58,716 | | | | |
| | Add 15% for general overheads | $ 1,300,000  195,000 | $ 111,328  16,705‡ | $ 1,188,672  178,300 | 8.57 | 33.5 | 31.1 | 24.7 |
| | | $ 1,495,000 | $ 128,023 | $ 1,366,977 | 8.57 | 33.5 | 31.1 | 24.7 |

*The difference in Biggs' depreciation of group G is that Williamson and Saville omit to deal with transportation equipment (item G-3) which Biggs depreciates 91.7%. Their depreciation of other items in group G are, Biggs 26.7%, Williamson and Saville 22.5%.

†8.57% of $64,220.

‡8.57% of $195,000.

There was a stipulation between the Company and the City that the correct total cost of labor and material (exclusive of overhead allowance) to reproduce new the Company's physical properties was $1,300,000. This is the stipulation referred to in Tables I and II. It affects also the treatment of depreciation percentages of the several witnesses, and is copied at length into the footnote.[17]

Upon an inspection of Tables II and III it will be seen that the difference between the Company's estimate of reproduction new cost less depreciation plus going concern value, etc., and the Commission's estimate therefor is $576,-739, and that the difference is accounted for as follows:

1. The Commission excluded Tract A (118 acres) and Tract B (146 acres) valued[18] at approximately..............$ 77,700

2. The Commission excluded the following other items of real estate which are included in the Company's estimate at following amounts:[19]

A-11—Lot on Cedar street, with residence....$ 6,500

A-12—Right of way for pipe line construction of which has been abandoned............ 3,690

Three residences on the Barcroft reservoir tract which are rented out, the aggregate value of which according to average values assigned by the Company's witnesses is approximately[20] ......................... 7,100

$ 17,290

---

[17] "It is stipulated and agreed * * * that the present reproduction cost undepreciated of the physical properties * * *, exclusive of land and exclusive of overhead, is $1,300,000; and that the percentage of increase or decrease of the estimates of the respective parties that $1,300,000 bears to the original estimates shall apply to the accrued depreciation as originally determined by the engineers of the respective parties."

[18] No separate values are assigned by the Company's witnesses to these two tracts, but after a careful review of all the evidence bearing on the point it would appear that $77,700 is approximately the average aggregate value assigned to the two tracts by the Company's witnesses, Kane, Graham, Jones and Church; and that this was approximately the value placed upon these two tracts by Kane and Graham in the appraisal made by them for the American Water Works and Electric Company in 1928.

As we have heretofore held, the exclusion of Tracts A and B from lands used and useful was not an invalid exercise of the Commission's legislative (or administrative) discretion; and it must stand upon a purely judicial review of its action.

[19] The Commission's action in excluding the three items below listed is not assigned as error.

[20] Aggregate average of values assigned by City's witness is $8,016.

3. The Company's estimate of the present fair value of real estate, other than that mentioned in 1 and 2 above is $226,696, while the Commission's estimate is $137,496.[21] Difference .......................................$  89,200

4. Additions for general overheads:

   (4a) The Company adds to its estimate of present value of all its lands fifteen per centum ($48,253) for general overheads. The Commission adds to its findings of present value of lands held by it to be used and useful 11.78 per centum ($16,197) for general overheads. Difference .........................................  32,056

   (4b) The Company adds to its estimate of labor and material cost of reproduction new of its physical properties (other than land) fifteen per centum ($195,000) for general overheads. The Commission makes a corresponding addition of 13.91 per centum ($180,830) for general overheads. Difference ....................  14,170

5. Deductions for Depreciation:

   The Commission deducts for depreciation of physical properties (other than land) 24.7 per centum of its estimate of production new cost, which amounts to $365,746. The Company deducts for depreciation only 8.57 per centum of its corresponding estimate, which amounts to $128,023. Difference ..............................  237,723

                                                          $ 468,139

6. Preliminary and Organization Expense:

   In addition to general overheads, the Company adds $19,000 for this item. Such allowance as the Commission finds proper for this item it includes in the allowances for general overheads. Difference ......................  19,000

7. Going Value:

   The Company estimates its going value at $150,000. The Commission finds for this item $60,000. Difference..  90,000

These seven items of difference aggregate $577,139. But the Commission allowed $400 more for materials and supplies and working capital than the Company's witnesses testified was required for these items. This reduces the net difference to $576,739.

We have heretofore held that the exclusion of tracts A and B was not an illegal exercise of the legislative (or administrative) discretion of the Commission; and could not be disturbed in a purely judicial review of its action.

There is ample evidence to sustain the action of the Com-

---

[21] There is ample evidence to support the Commission's value of $137,496 for land held by it to be used and useful; and its action in finding that as the value thereof is not assigned as error.

mission in excluding from the inventory of property used and useful the items mentioned under 2 *ante,* and also the finding of the Commission as to the present value of the land which it found to be used and useful (3 *ante*). The appellant seems to recognize this, and has not assigned as error the rulings of the Commission on these points.

In considering allowances for general overheads these basic principles are to be borne in mind. (a) Certain administrative and legal costs, (b) engineering and supervision cost, and (c) interest on the money expended in the acquisition and construction from the time expended until construction has progressed to such an extent as to make it usable for the purpose for which the acquisition or construction is designed, are as much a part of the cost of producing or reproducing a property as are the cost of labor and materials that go into the actual construction of the individual items thereof. They are not a loading added to the cost of construction as a make-weight or for good measure. In any estimate of the cost of constructing or reproducing a property, the sums added to labor and material costs and to present value of land for such items should be determined in the same general manner that labor and material costs are determined. Experience interpreted and applied to the case before the Commission in the light of sound judgment is the best criterion. There is no sound reason for being more or less stringent in the determination of these items of cost than in the determination of what is commonly understood by labor and material cost.

In so far as preliminary and organization expense relates to the organization and establishment of the corporation, it is an expense which may be properly amortized over a period of years as an expense item; but should not be capitalized or carried into a rate base. This is true also of the cost of the acquisition of business and of any administrative and legal expenses which may not reasonably be said to be directly connected with the cost of acquisition of land or the acquisition and/or construction of physical properties other than land.

■ Experience has shown that in any effort to estimate the cost to construct a building or plant items of cost which must be met will be found to have been overlooked. A reasonable allowance should be made for these. The amount will depend to some extent upon the care and detail with which the cost estimates have been made. But there is no sound reason for such an allowance on the present value of land. Some allowance may, however, be made under some circumstances for contingencies and omissions in the amount added to the present value of land for engineering, supervision, interest during construction, and administrative and legal costs incident to its acquisition and development for use.

A careful analysis of the allowances for overheads claimed by the Company and those allowed by the Commission and the evidence relating thereto seems to show that they were as follows:

Percentage of estimated cost of labor and material added thereto for overheads on properties other than lands and rights of way:

TABLE IV

|  | (a)<br>By Company's<br>witnesses<br>Per cent | (b)<br>By Com-<br>sion<br>Per cent[22] |
|---|---|---|
| Omissions and contingencies | 2.02 | 2.00 |
| Administration and legal expense | 1.50 | 1.61 |
| Engineering and supervision | 6.61 | 5.42 |
| Interest during construction | 5.00 | 4.88 |
| Total | 15.13[23] | 13.91 |

[22] The percentages named by the Commission in its opinion as having been applied for the several overheads were in most instances applied to bases other than *mere* cost of labor and materials. When lands and rights of way are separated from other properties, and the amounts allowed by the Commission for the several overheads are expressed in percentages of mere cost of labor and material, the percentages are as here stated.

[23] Adjusted by Company's witness, Biggs, to fifteen per centum and so used. The evidence affords reason for concluding that the adjustment should be taken to have been made in interest during construction, which would give that item as 4.87 per centum.

Percentages of present value of lands and rights of way added for overheads:

|  | (a) By Company's witnesses Per cent[24] | (b) By Commision Per cent |
|---|---|---|
| Omissions and contingencies | .5 | 0 |
| Administrative and legal expense | 1.5 | 1.51 |
| Engineering and supervision | 1. | 1. |
| Interest during construction | 12. | 9.23 |
| Total | 15. | 11.74[25] |

[24] Company's witness Biggs testified that in his preliminary figures for overheads he got an amount which was 15.4 per centum of the total of labor and material cost plus present value of land, which he adjusted to fifteen per centum, and used that percentage. While he does not so state, it would appear that either the 2.02 per centum for omissions and contingencies was reduced to .5 per centum, or a corresponding reduction made in administrative and legal expense. We have treated the reduction as being made in omissions and contingencies.

[25] Actually used 11.78 per centum.

The most material differences between the percentages used by the Company's witnesses and those used by the Commission are in (a) interest on present value of land during construction, and (b) engineering and supervision of construction. The differences in interest during construction seem to be due entirely to the differences in the period which the estimate of the Company's witnesses as to the time which would be required to reproduce the property and the Commission's estimate of that time.

The Company's witnesses, the City's witnesses, and the Commission assume that all lands and rights of way would be acquired before construction would be begun; that money would cost six per centum per annum, and that it would flow in as needed in the progress of work.

The Company's witness, Milholland, assumes that it would require two years, after the lands and rights of way had been acquired, to reproduce the property. On this

basis he allows for interest during construction twelve per centum of the present value of lands and approximately five per centum of the cost of labor and material. The city's witnesses assume a construction period of only one year, and that three per centum of the cost of labor and materials would be sufficient to cover interest during construction on both the cost of lands and rights of way, labor and material cost and all other expenditures.

The Commission concluded, we think with good reason, that it was more reasonable to assume a construction period of eighteen months; and it has, in effect, adopted the estimate of the Company's witnesses for interest during construction, except that, having reduced the construction period assumed by them by one-fourth, it has reduced their percentage allowance for interest during construction on present value of land approximately one-fourth, and has made a slight reduction in the percentage allowance for this item on cost of construction of other items. We are of opinion that the Commission's treatment of interest during construction is reasonable and just.

Milholland testified that his figures for engineering and supervision was an amount which was "approximately 5.5 per centum" of the sum gotten by adding labor and material cost and the present value of lands and rights of way; but that in computing it, he added only one per centum on the present value of lands and rights of way for engineering and supervision. From this it is readily shown that his composite percentage added to the labor and material costs of properties other than lands and rights of way was approximately 6.61 per centum. This he breaks down as follows: Source of supply ten per centum; buildings and structures five per centum; pumping machinery and equipment five per centum; distribution system, other than services and meters, five per centum; services and meters and general equipment nothing. While he does not expressly so state, upon analysis it is evident that he has also used five per centum for the purification system.

He further testified that he used ten per centum for en-

gineering and supervision on source of supply construction, because this was the actual amount that was paid the engineer who designed and supervised the construction of the Barcroft dam in 1913-15, exclusive of the fee paid for outside engineering service. The estimate of the labor and material cost of source of supply construction is $478,131, of which $449,839 is for the Barcroft dam. Even should it be assumed that ten per centum is correct for engineering and supervision on the Barcroft dam, we think the evidence fails to show any reason why so large a percentage should be applied to the other items of this group (aggregating $38,292) which appear to be items not requiring any considerable engineering cost.

With reference to its percentage used for engineering cost, the Commission says:

"The Commission is of the opinion that under reproduction cost new today this engineering [*i. e.*, that for the Barcroft dam] would not exceed 7.5 per centum. Using this 7.5 per centum for the item of source of supply, we get a composite percentage of 4.8 per centum, which the Commission uses for its estimate of engineering and supervision."

It is evident, however, that the Commission has departed from the percentages used by the Company's witnesses in some respects other than the use of 7.5 per centum instead of ten per centum on source of supply construction. The composite percentage which would be gotten by accepting the other percentages used by Milholland and substituting 7.5 per centum for ten per centum for source of supply construction would be 5.89 per centum, while the Commission's composite percentage of labor and material cost allowed for engineering is 5.42 per centum.[26]

Upon consideration of all the evidence bearing upon this question, we are of opinion that the Commission's allowances for engineering and supervision, as well as for other items of overhead, are reasonably sufficient; and that

[26] The corresponding percentage used by Williamson and Saville is four per centum.

its allowance for administrative, legal, preliminary, and organization expense is sufficient to include preliminary and organization expenses, in so far as they constitute elements of value upon which the Company is entitled to earn a return. In short, we find no error in the Commission's allowances for general overheads.

Upon an analysis of the evidence it becomes evident that the wide differences between the depreciation estimates of Biggs (the Company's witness) and Williamson and Saville (the City's witnesses) is mainly due to three things: (1) differences as to what are the correct principles to be applied in estimating accrued depreciation in a reproduction new cost less depreciation estimate, or study, made for use as evidence of value; and (2) differences in methods of applying principles, even those upon which all three agree; and (3) differences in their observation of observable physical deterioration.

So far as the differences rest upon differences in actual inspections and observations, Biggs has evidently made a more extensive, careful and detailed inspection of the properties than has either Williamson or Saville. But an analysis of their testimony shows plainly that the most material differences in the depreciation estimates of these three engineers are due not to differences in their actual observations, but to differences as to what principles should be applied and as to the correct methods of applying these principles.

The following quotations from Biggs' testimony give his definition of accrued depreciation, and indicate the principles he deems should be and has applied. They are taken from various parts of his testimony, and do not in all instances occur in the sequence in which we have arranged them; but we have been careful to see that the changes made in sequence do not change their sense in any particular:

"My definition of accrued depreciation of water works property is the difference in the value if the property were new and the value of the property in its existing condition." * * * "I have used what is generally termed the inspection

or observation method and not the theoretical method which has been used in some instances particularly in the past, which method contemplates some ratio between the actual age of the different parts of the property and a guess at life expectancy."

(This method) "Is very generally adopted now by engineers desiring to arrive at the accurate amount of accrued depreciation rather than * * * any theoretical method contemplating the use of age and life expectancy." * * * "When I first started in valuation work, I adhered to the method of life expectancy. I was a slàve to the old method until I began to see the fallacy of it, until the courts began to decree that actual depreciation was the thing to consider rather than theoretical depreciation."

"The inspection method * * * requires considerable time if the inspection is made properly in order to try and determine accurately the amount of accrued depreciation. It also requires consideration of various elements of the property as to their fitness for the service which they perform, that is, what, if any, obsolescence exists. Those parts of the property that are visible can, of course, be readily examined, their condition ascertained, and I think a very accurate estimate made of their departure from the standard new. * * *

"Generally speaking the water works property naturally falls into two groups, in one of which the present depreciation can be determined by estimating the expenses necessary to restore the condition of the property to that as good as if it were new. * * * In such group of property there is, as I have studied the depreciation of this property, buildings, meters, valves, pumping machinery, and machinery, reservoirs and other structures not made of material which is subject to actual corrosion and physical decay.

"In the second group of properties there is an actual corrosion or physical decay that takes place which results in accrued depreciation and which it is impossible to restore to a condition as good as new by expenditure of any amount of money less than the replacement cost itself. On such

class of property the accrued depreciation has been estimated by the actual loss due to corrosion and decay. In this group of property are, generally speaking, included such items as boilers, steel stacks, steel pipe, standpipes, and in general property which is constructed of steel and where corrosion and physical decay has taken place regardless of obsolescence, and eventually the property will pass out of existence for this cause."

"In making my estimates I have used approximately the unit prices applied by Mr. Milholland * * * increased from ten to twenty-five per centum where in my judgment the necessity of the work required a higher price than the unit price used by Mr. Milholland. In addition, I have estimated the cost of making all possible repairs to the structure to bring it into condition good as new, adding an item * * * of twenty per centum * * * [because] of the known difficulty in estimating accurately work of this character, and for possible omissions and defects which may have escaped my attention when making the inspection to determine the amount of accrued depreciation. * * *

"I have not considered the age as affecting the value of any item of property that is susceptible by replacement or reconstruction of parts of it, of being put into the condition identical with the condition it was when new, and if that same structure was new and there was no obsolescence I have not applied any obsolescence to the value if that structure depreciated. * * * If the engineering profession has gotten to a point that it has to know the date a thing was built before determining its accrued depreciation, then it has sunk pretty low."[27]

---

[27] There are very few items to the age of which Biggs seems to have given any weight in determining depreciation. The most important items, if indeed not the only items, which he has depreciated on the basis of their age are the boiler (D-7) and the galvanized steel, wrought iron and lead pipe in items F-9 and 10, which he depreciates three and one-third per centum for each year of service age. However, after testifying that he had given no weight to either the age or the probable service life of the Barcroft dam in estimating the accrued depreciation thereof, he admits that in his estimate of the annual depreciation, which should be allowed as an expense item, he has included a yearly allowance of .04 per centum of the total

"When there was obsolescence I have allowed for it. I have allowed existing obsolescence, and I have not tried to look forward into the future and allow for any future obsolescence, nor have I asked the water consumers * * * to pay me a rate for accrued depreciation (by way of an annual depreciation as an expense item) based on the guess of a future obsolescence, but only on the obsolescence now in the plant."

"In connection with obsolescence, that covers existing obsolescence wherever referred to. If an item of property is obsolete at the present time, I have made a subtraction for such obsolescence; but if it is thought or presumed that some item of property may become obsolete in the future on account of a change in the art or for any other reason, I have made no subtraction * * * on this account. I have considered the property as it is now being used in determining what amount should be deducted for obsolescence."

The unit (item D-1), composed of the Morris pump (installed 1851) and Fitz overshot wheel (installed 1902) is "the only piece of equipment used for pumping water in this [Cameron] station that could be considered obsolete in any way. The other pumping engines are modern and of a type that can be procured today at reasonable cost from the manufacturers and are serving their purpose in every way." * * * "I have subtracted nothing for obsolescence of the existing cast iron pipe system."[28]

Biggs makes it plain that he has made no deduction in any of his depreciation estimates (or otherwise) for any of these factors, (a) inadequacy, (b) overadequacy, (c) inappropriate engineering or construction, and (d) what is

estimated reproduction new cost (including overheads) of the dam, and that the purpose of such an allowance is to build up a depreciation or retirement reserve for this dam.

[28] Biggs expressly states that he made no allowance for obsolescence in estimating the depreciation of Barcroft dam (B-1), Cameron pump house (C-1), Cameron race (B-3), most of the items in group D, or the cast iron pipe (items D-13 and F-7 and 8); and, we think, his testimony shows that the *only item* (unless it be some items of small moment) which he has depreciated for obsolescence is the Morris pump and Fitz water wheel (item D-1) at the Cameron pumping station.

described by Williamson as "probability of functional depreciation by reason of the likelihood of improvements in the immediate future of manufacture, construction or operation," except where he has in effect retired some items of property by depreciating them 100 per centum. He gives as his reason for not making deductions for factors (a), (b) and (c) that in his opinion they do not exist in this property; and it is clear from his testimony that upon principle he does not regard factor (d) as a factor which should be considered in determining accrued depreciation of property still used and useful.

For practical purposes, it may be said that with a few exceptions Biggs' testimony shows that his estimates of depreciation are limited to estimates of actually observable and observed physical deterioration, and are measured by his estimate of the cost of putting the items in condition as good as new with twenty per centum added for good measure. The principal, if not the only, exceptions to the above observation are:

| ITEM | Biggs' estimate of labor and material cost to reproduce |
|---|---|
| D-1, Morris pump and Fitz water wheel.................. | $       8,484 |
| D-7, boiler............................................................ | 2,990 |
| F-9 and F-10, wrought iron, steel and lead pipe.... | 15,164 |
| Total............................................................ | $     26,638 |

The following quotation from Williamson's testimony fairly gives his and Saville's definition of accrued depreciation and indicates the principles which they deem should be applied and have undertaken to apply:

"In order to estimate the accrued depreciation in any utility, it is necessary to study carefully the present and probable future demands of service and capacity, the nature, growth and stability of the community served, the availability of the sources of supply and their capacity, the

ability of individual units to perform their intended function both as to capacity and as to efficiency, together with the actual physical deterioration of the units which make up the plant. Inspection alone cannot be relied upon to determine the present worth of a plant, the value preponderance of which is represented by units which cannot be adequately inspected to determine bare physical deterioration. Average life tables are manifestly untrustworthy as a measure of present worth in that they do not take into consideration the actual conditions under which any given unit is operated unless by the merest chance that operation happens to exactly parallel the average conditions upon which the life expectancy tables are based. Then in addition to the study of the above mentioned elements proper weight must be given to the advancement in the arts of construction and manufacture which enter into the materials, machines, equipment, etc., which go to make up the water works utility.

"Depreciation must be estimated for there is no definite gauge by which it can be determined with mathematical precision. Basically, any estimate is a best judgment determination and must depend for its soundness upon a careful and systematic building up of essential data. Manifestly, the more careful and systematic the process, the more accurate the estimate.

"In estimating the accrued depreciation of the Alexandria Water Company, we have based our estimates primarily upon two types of depreciation: (1) physical; and (2) functional. Under (1) we include: (a) Physical decay of constituent materials; (b) wear and tear and deferred maintenance, including extraordinary repairs. Under (2) we include: (a) Inadequacy, and (b) obsolescence. Upon giving the above elements their proper weight our estimate is then modified or stabilized to allow for probability of future functional depreciation by reason of the likelihood of improvements in the immediate future of manufacture, construction or operation.

"As a guide in estimating, especially the physical de-

preciation, we make use of age and life expectancy tables in order that this portion of the depreciation may not get out of hand. In other words, if one examines a brick wall which had been standing for a hundred years, there may not be evidence of physical deterioration apparent to the observer. On the other hand, we know from experience that a hundred years ago the mortar used in constructing brick walls was nowhere near equal to that of the present day. Likewise the bricks themselves were crudely manufactured and do not have the resistance to wear and tear and the action of the elements of the brick manufactured today. However, it is impossible to tell by inspection whether or not there has occurred a loss of bond between brick and mortar joints; what effect the rain has had in leeching out constituent materials of the mortar; what effect the penetration of water and frost through brick and mortar joints has had, and our only recourse, therefore, is to the experience of others and of ourselves, by which we know that this brick wall is not by any means as good today as it was a hundred years ago. We also know that this same brick wall cannot be put back in its original condition except through its entire demolition and reconstruction—in which event it will be a better brick wall than the original, because of the improvements in the arts of construction.

"Our method of depreciation, therefore, depends not only upon one element but is a combination of inspection, of study of use, operation and efficiency, and of the proven march of physical deterioration in all materials, structures and machines as they grow older. This method which we have used is vastly more comprehensive than what may be termed the 'one-horse shay' theory, where a unit remains or is maintained in condition new throughout its entire length of life until at some unknown date it falls to pieces and its worth becomes zero."

We are of opinion that the principles announced by Williamson and Saville are more nearly correct than those announced by Biggs.

■ In making a reproduction new cost less depreciation study of a property for use as evidence of its present fair value, the depreciation to be ascertained is depreciation in value to whatever cause that depreciation may be due. Observable physical deterioration is always an important factor in determining accrued depreciation; but due weight should also be given to every other existing factor which has the effect of reducing the present fair value of the property below its reproduction new cost.

There may be and often is present in units of a property, in addition to observable physical deterioration, physical deterioration which is not observable but from common experience is known to exist. In many instances one of the best indicators of the extent of such deterioration is the ratio of past service life to the total reasonably to be expected service life of the unit.

■ A unit may be obsolete or outmoded either in whole or to a degree which affects its worth as an element of value of the property, though it may still be rendering efficient service. However, a unit may not properly be depreciated on the grounds of obsolescence on a mere conjecture that improvements in manufacture, construction, or operation will be devised which will render it obsolete. The obsolescence must be actually existing obsolescence, not anticipated obsolescence.

■ The value of a plant or a unit thereof may be adversely affected by the fact that it is either inadequate or overadequate to meet the present and/or reasonably to be expected future use thereof, though it be rendering efficient service for such a plant or unit.

■ The fact that a plant or a unit thereof is not well adapted to, or is inappropriate for, its present and/or reasonably to be anticipated future use tends materially to reduce its value below its reproduction new cost. One of the forms of inappropriateness is inappropriate engineering layout.

There may be machinery or equipment which, though used or usable to some extent, for instance as standby equip-

ment, would not under good engineering or plant practice be replaced if destroyed or provided if not there. As an element of the present value of the plant, the value of such machinery or equipment is far less than its reproduction new cost.

All such factors, as well as observable deprecia-·tion, should be given due weight in determining depreciation in a reproduction new cost less depreciation study. As said by Mr. Chief Justice Hughes in *Lindheimer* v. *Ill. Bell Tel. Co.*, 292 U. S. 151, 78 L. Ed. 1182, 54 S. Ct. 658, 664, "broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence."

Upon a review of the evidence we are of opinion that the Commission was right in rejecting Biggs' estimates of the depreciation existing in most of the units of this property as being too low. He has adhered too closely to allowances only for observed physical deterioration. On the other hand we are of opinion that it was correct in refusing in most instances to accept Williamson's and Saville's estimates of depreciation. Generally speaking, they have carried the application of consideration of age in service and of what they designate as functional depreciation too far. The Commission's composite percentage for depreciation is very near to being Biggs', Williamson's and Saville's percentages added together and divided by three; but it does not appear to have been gotten in this way. It gives its conclusions as to the percentage of depreciation existing in each group of property, but gives little information as to how it arrived at its percentages for the several groups. The only way to test its correctness is to examine the evidence relating to the depreciation existing in the several items of the several groups.

Approximately eighty-eight per centum of the estimated total cost of reproducing the Company's physical properties other than land is the cost of reproducing groups B and F,

and we shall consider the Commission's estimates of the depreciation in these groups before taking up the other groups.

In Table V is given (1) a brief description of the items composing group B (source of supply construction), (2) year of original construction where given, (3) Biggs' estimated cost of labor and material to reproduce new, and (4) Biggs' (5) Williamson's and (6) Saville's estimates of the depreciation therein expressed in percentages of labor and material cost plus overheads, and in column 7 the Commission's composite percentage for the group:

TABLE V

| 1. | 2. | 3. | 4. | 5. | 6. | 7. |
|---|---|---|---|---|---|---|
| B-1—Bancroft dam.............. | 1913-15 | $ 449,839 | 0.5% | 20% | 16% | ........... |
| B-2—Diversion dam Cameron run.............. | 1790 | 7,653 | 20.5 | 50 | 90 | |
| B-3—Cameron race.............. | 1790 | 9,060 | 0[29] | 90 | 50 | ........... |
| B-4—Structures along race | | 7,663 | 15 | 90 | 50 | ........... |
| B-5—Race in pumping station lot...................... | | 1,949 | 25.5 | 90 | 50 | ........... |
| B-6—Intake well.................. | | 867 | 14 | 90 | 50 | ........... |
| B-7—Bell Haven booster station[30].................... | | 1,100 | 100 | 100 | 100 | ........... |
| For group as a whole | | $ 478,131 | 1.47 | 23.4 | 18.3 | 16% |

[29] Depreciation stated as $36.
[30] Depreciated 100 per centum because no longer used and useful.

Biggs' estimates are limited to physical deterioration actually observable and observed upon an inspection of these structures. Saville's estimate of the Barcroft dam (as is also Williamson's) is dominated by the assumption of a service life expectancy for this dam of 100 years and the assignment to it of an accumulated depreciation of one per centum a year. The Commission has adopted Saville's method of estimating the depreciation in this dam and depreciated it at one per centum a year for each year of its age, taking its age as fifteen years. This is an excellently built concrete dam which shows practically no observable

deterioration, though Biggs has estimated its observable depreciation at .5 per centum. Some recognition of its age would seem proper; but upon a review of all the evidence bearing on the point we are unable to reach the conclusion that this dam, which should be constructed if it were not now in existence, is, as an element of value in this property, now worth fifteen per centum less than it would be if it had been constructed only yesterday. We are of opinion that a depreciation of more than 7.5 per centum would more than represent any depreciation of this dam as an element of value in this property.

Williamson's and Saville's estimates of depreciation on the other items of the group are evidently based largely upon the view that a gravity pipe line should be constructed from the Barcroft dam to the reservoir, and the use of these items largely abandoned. The Commission (we think correctly) did not adopt this view; and the depreciation in these items must be determined on the assumption that they will continue to be used for the same service for which they are now used.

When the nature of their construction is taken into consideration, we are of opinion that the depreciation percentages properly applicable to the other items of group B are approximately as follows: B-2, 30%, B-3, 0%, B-4, 25%, B-5, 25.5%, B-6, 14%, B-7, 100%. Using these percentages and 7.5 per centum for the Barcroft dam gives a composite percentage for the group of 8.3 per centum, as compared with the Commission's sixteen per centum for the group. Expressed in dollars we find the Commission's dollar deduction[31] for depreciation of group B to be approximately $42,000 too large.

In its opinion the Commission gives this very good general description of the Company's distribution system:

"From the Cameron run pump station water is delivered through two discharge mains of eight and twelve inches in

[31] When we refer to the Commission's dollar depreciation we are taking its total dollar depreciation as $365,746 as shown in Table I, item 7, column 4.

diameter, a distance of about one-quarter of a mile to the filter plant. The delivery is made direct into two sedimentation tanks each forty-four feet in diameter by sixteen feet high. From these sedimentation tanks water flows by gravity to the rapid sand filter, consisting of six rapid sand filters, each equipped with rate of flow gauges and simplex rate controllers. From the filters the water flows by gravity through a concrete flume and cast iron pipe into the distributing reservoirs.[32] These reservoirs, referred to as reservoirs Nos. 1, and 2 in the record, are of cut and fill construction with masonry lining, the lining of reservoir No. 1 being of brick, and of reservoir No. 2 being of stone. The elevation at the top of these reservoirs is 96.5 feet, and the greater portion of the consumers served are supplied from these reservoirs by gravity. The water leaves the reservoirs through twenty inch, twelve inch and ten inch mains, and the territory thus supplied is in general that territory lying below elevation contour fifty, shown by the green shaded area on the topographical map, Exhibit 5.

"In addition to the two distributing reservoirs already mentioned, there is a third, known as the St. Elmo reservoir, which is located at the northern end of the low service distribution system. This is a concrete covered basin of 700,000 gallons capacity, located at an elevation of about thirteen and one-half feet below the level of the main distributing reservoirs. This basin acts as an equalizer on the low service system and evens up the pressure at the northern end of the system during the times of high flow.

"Adjacent to the filter plant and distributing reservoirs is a high service pumping station, containing two motor driven centrifugal pumps. These pumps deliver water through a twelve inch line to what is known as the Jefferson Park high service system, connected to which there is a standpipe forty feet in diameter by seventy-five feet high, at a ground elevation of 200, and an elevation at the top of the tank of 275. These high service pumps operate at a

---

[32] The items classified as distribution system (*i. e.*, group F) begin with these reservoirs.

delivery head from 190 to 210 feet, depending upon the conditions.

"To the west of the Jefferson Park standpipe there is a second booster station and tank, located on the grounds of the Theological Seminary. This tank has a capacity in excess of 50,000 gallons, with an elevation at the top of the tank of 341. To the south of the city and across Hunting creek there is another small area, which is served through a booster station, known as Belle Haven. At this station there is a 100 gallon per minute centrifugal pump, which delivers water into a wooden tank on a steel tower, having a capacity of 20,000 gallons.

"The distribution system consists of approximately sixty-two miles of mains, approximately five miles of which are steel mains three inches and smaller in size, and the balance of cast iron, varying in size from four to twenty inches. The service pipes from the main to the consumer's premises, with the exception of the corporation cocks and curb boxes, are owned and maintained by the consumers, and the fire hydrants and branches are owned and maintained by the city council of Alexandria.

"The average pumpage during the year 1930 varied from 55,000,000 gallons to 99,000,000 gallons per month.[33]

"The Company had on December 31, 1930, about 5,545 active services, of which about 840 were metered, the remainder being on a flat rate basis."

In Table VI are given (column 1) the items of group F, (column 2) date of original installation of some of them, (column 3) Milholland's estimated cost of labor and material to reproduce new, and (columns 4, 5 and 6) Biggs', Williamson's and Saville's estimated depreciation percentages. The Commission's composite depreciation percentage for the group is twenty-seven per centum.

Biggs has depreciated items F-1 to F-6 (both inclusive)

[33] This is the total quantity of water pumped. Of the water pumped approximately 15,900,000 gallons a month is pumped directly from the Cameron pumping station to the Southern Railway Company without passing through the reservoir or the distribution pipe line system.

for observable depreciation only, but in this, as in all other instances, he has added twenty per centum to his estimate for good measure.

Williamson testifies as follows with reference to the reasons for his and Saville's depreciation estimates for these items:

"Under this group we must consider items 1 and 2, reservoirs Nos. 1 and 2, respectively. They have been depreciated fifty per centum in deference to physical deter-

TABLE VI

| 1. | 2. Date installed | 3. Milholland's labor and material cost to reproduce | Depreciation percentages | | |
|---|---|---|---|---|---|
| | | | 4. Biggs | 5. Williamson | 6. Saville |
| F-1—Reservoir No. 1, capacity 2,500,000 gal | 1852 | $ 41,144 | 4.5 | 50 | 50 |
| F-2—Reservoir No. 2, capacity 14,000,000 gal | 1875 | 50,927 | 14.5 | 50 | 50 |
| F-3—St. Elmo Reservoir, capacity 700,000 gal | 1927 | 24,328 | .5 | 5 | 5 |
| F-4—Jefferson Park stand-pipe, steel | 1928 | 16,424 | 8.2 | 6 | 6 |
| F-5—Seminary tank, steel, capacity 50,000 gal | 1913 | 4,400 | 3.9 | 50 | 50 |
| F-6—Belle Haven tank, wood, capacity 20,000 gal | 1925 | 2,520 | 6.7 | 50 | 50 |
| F-7 and 8—Cast iron pipe in distributing system, pipe $286,260, laying $217,346 | | 503,606 | 10.4 | 34.7 | 34.7 |
| F-9 and 10—Galvanized steel, wrought iron, and lead pipe in distributing system, pipe $7,666, laying $7,498 | | 15,164 | 16.6 | 49.9 | 49.9 |
| F-11—Gate valves and boxes | | 23,493 | 3.5 | 30 | 30 |
| F-12—Services | | 16,364 | 15.3 | 20 | 20 |
| F-13—Meters and meter boxes | | 25,362 | 5.8 | 20 | 20 |
| | | $ 723,732 | 9.8 | 33.7 | 31.1 |

ioration and to the fact that they are not needed in such large capacity under the present or any probable future method of operating this plant, and further to the fact that when a new source of supply is developed, and if the pipe line is brought from the Barcroft reservoir, that it should be at a higher elevation in order to increase the pressure in the low-lying area of Alexandria and to curtail the necessity for boosting in the so-called 'high-pressure' areas; and this represents our estimate of their serviceability, giving them a probable future life of fifty years, during which they can and probably will be used for a time as principal elements in the plant and latterly as a simple storage for emergency.

"The St. Elmo reservoir is depreciated solely for physical deterioration as are the Jefferson Park standpipe and the Seminary and Belle Haven tanks."

In estimating the depreciation of these items we think no weight should be given to the view that a pipe line should be laid from the Barcroft dam to these reservoirs and the use of the Cameron pumping station largely abandoned. But we agree with Williamson's and Saville's view that, since the construction of the Barcroft dam (which impounds 617,000,000 gallons of water) these two reservoirs are much larger than the present or any reasonably to be anticipated future operation of this plant reasonably requires, and that, therefore, as component elements of value of this plant they are not now worth their reproduction new cost less their physical deterioration. However, we are not able to say that their value is depreciated by the whole amount it would cost to reproduce their excess in size. In the light of all the evidence bearing on the question, we are of opinion that the functional depreciation in these reservoirs due to their now unnecessarily large size is approximately twenty-five per centum in the case of reservoir No. 1 and thirty-five per centum in the case of reservoir No. 2; that Biggs' estimates of their physical deterioration is approximately correct; and that the aggregate depreciation in value as a part of this plant of

reservoir No. 1 is approximately thirty per centum, and of reservoir No. 2 approximately fifty per centum.

Williamson and Saville testify that they have depreciated the St. Elmo reservoir (F-3), Jefferson Park standpipe (F-4), Seminary tank (F-5), and Belle Haven tank (F-6) "solely for physical deterioration." But it is patent that in doing so they have in each case taken the ratio of service age to their estimated-to-be-expected service life as approximately the measure of the percentage of depreciation existing in the unit. They estimate the total useful life of these units as follows: St. Elmo reservoir ninety-five years, Jefferson standpipe thirty-five years, Seminary tank twenty years, and the Belle Haven tank twenty years. In the light of all the evidence we are of opinion that Biggs' estimate of the percentage of depreciation in the Jefferson standpipe (8.2 per centum) is approximately correct; that Biggs' estimate of the depreciation of the St. Elmo reservoir at .5 per centum is too low, Williamson's and Saville's too high, and that 2.5 per centum is more nearly the correct percentage of depreciation in value of that unit; and that it is reasonable to accept as the depreciation in the Seminary tank twenty-five per centum and in the Belle Haven tank twenty per centum.

Williamson and Saville estimate the percentage of depreciation in items F-12 and F-13 at twenty per centum. These estimates seem to us to be reasonable.

There is in the distribution system the following quantities of galvanized steel, wrought-iron and lead mains: four inch pipe 3,027 feet, three inch pipe 3,292 feet, two and one-half inch pipe 1,273 feet, two inch pipe 14,991 feet, one and one-half inch pipe 1,449 feet, one and one-fourth inch (or smaller) pipe 1,911 feet. This gives a total for this class of pipe of 4.93 miles. This pipe and the laying thereof constitute items F-9 and F-10.

Biggs testified that he had depreciated the steel and galvanized iron pipe in the plant at three and one-third per centum for each year of its service life. This makes his estimate of the average service life of pipe of this character

thirty years before it has to be discarded on account of physical deterioration, and his estimate of the average age in service of this type of pipe in this plant five years. Williamson and Saville estimate the average service life of pipe of this character to be fifteen years and the average age of this type of pipe in the plant to be seven and one-half years. When we take into consideration the extent to which tuberculation occurs in the pipe in this plant; that pipe of this type cannot be cleaned satisfactorily, and that a very small part of this 4.93 miles of pipe is of sufficient size to furnish water for fire protection[34] it appears to us that the estimates of Williamson and Saville of the depreciation existing in this pipe (49.9 per centum) is approximately correct.

Items F-7 and F-8 consist of the cost of the cast iron pipe in the distribution system and the cost of laying it. Table VII gives some very pertinent information with reference to the cast iron pipe in the distribution system:

TABLE VII

| Size, diameter in inches | Quantity, linear feet | Per cent of total | Average age in place, years | Milholland's labor and material cost of pipe in place |
|---|---|---|---|---|
| 4 | 96,995 | 32.00[35] | 37 | $ 99,905 |
| 6 | 123,791 | 40.80 | 20 | 171,938 |
| 8 | 29,641 | 9.81 | 24 | 54,688 |
| 10 | 23,362 | 7.71 | 23 | 55,219 |
| 12 | 21,975 | 7.24 | 16 | 64,523 |
| 16 | 3,329 | 1.10 | 37 | 14,182 |
| 20 | 4,246 | 1.14 | 41 | 23,794 |
| Specials | | | | 19,357 |
| | 303,339 ft. (57.45 miles) | 99.80 | | $ 503,606 |

[34] The pith of this will appear from what is hereafter said.
[35] The percentages given by Milholland in his Exhibit 25 appear to be percentages of all pipe in the distribution system, that is they take into account steel and wrought iron mains as well as cast iron mains.

Most of the four inch pipe is in what is known as the old city of Alexandria, which includes the most important business and residential sections served by the Company, and much of it was laid in 1851 and 1852.

The testimony of the Company's witness Biggs gives this information with reference to the formation of tubercules on the interior surfaces of the water pipes in this system. The carbon dioxide in the water at Alexandria acting upon the iron of the pipes causes tubercules to form on their interior surfaces, whether the pipes are coated with asphalt or not, but to a somewhat less extent in the coated pipe than in the uncoated. Though the formation of these tubercules decreases the carrying capacity of the pipes very materially, none of them have ever been cleaned since they were laid. By test he found that the tuberculation had reduced the carrying capacity of the four inch pipe laid in 1851 to fifty-three per centum of that of new pipe; and he estimates that the carrying capacity of pipes laid in 1924 has been reduced twenty-five or thirty per centum in the six years they have been in use. There are methods for cleaning cast iron pipes which have become thus tuberculated without taking them up. By so cleaning them their carrying capacity can be restored almost to their capacity when new. No satisfactory way has been found to clean steel or wrought iron pipe which has become tuberculated.

The City contends that in many parts of the city the pipe lines are too small to furnish an adequate supply of water for domestic and industrial purposes. It is probably true that in their present foul condition the four inch and smaller lines are not furnishing a satisfactory supply of water under satisfactory pressure for industrial and domestic use; but the evidence shows that, if these pipes are cleaned and kept cleaned,[36] for the present and the immediate future, the supply and pressure (except in a few exceptional cases) will be adequate to furnish water for industrial and domes-

[36] The Commission in its order of January 30, 1931, required the Company to proceed at once to clean its mains and to complete the cleaning within eleven months.

tic purposes. However, there is little if any margin left either in the four inch mains, or in some of the six inch feeder mains supplying four inch mains, for future increase in industrial and domestic demand.

The fire hydrants along the Company's lines have been installed and are owned and maintained by the city or other governmental unit in which they are situate. No charge is made by the Company *to the governmental unit* installing these hydrants either for permitting it to tap its mains or for water used for fire fighting purposes. The evidence sustains the contention of the Company that these hydrants have not been properly maintained, and that this has, at least in part, been responsible for fire fighters not being able at all times to make full use of the supply of water afforded by the Company's mains. But it also shows that a very large part of the Company's mains are inadequate, even when cleaned, to furnish a reasonably adequate supply of water for modern fire fighting purposes.

With reference to the capacity of the Company's distribution pipe line system to furnish water for fire protection in the territory served by its lines, and particularly with reference to its capacity to furnish water for fire protection for the main portion of the city of Alexandria, Biggs says:

"The system of the Alexandria Water Company was not primarily designed to furnish service under modern practice of extinguishment of fire." * * * "Under peak load of domestic consumption, except from the large feeder lines from the reservoir, * * * the system is not capable of furnishing water for the requirements made for the extinguishment of fires." * * * "It is not adequate to provide modern fire extinguishing service." * * * "It would fall very far short of meeting the requirements of the National Board of Fire Underwriters for the modern service required for fire extinguishing service."

The Alexandria Water Company was chartered by an act

of the General Assembly approved March 13, 1850 (Acts 1849-50, pp. 145-6),[37] which contains this provision:

"It shall and may be lawful for the said president and directors to sell and dispose of the water which they may have conducted into said town to the inhabitants thereof and to other persons, in such manner and at such prices as to them from time to time shall seem expedient for the interest of said Company: *Provided however,* That in case of calamity by fire it shall be the duty of said company, their officers and agents, under proper and convenient regulations made for the purpose, without hesitation [to] throw open and make easy of access any reservoirs, water plugs, hydrants or other fixtures, containing or affording a supply of water, for the purpose of enabling the citizens of said town, fire companies or others the more readily to extinguish the flames free of any fee, charge or demand whatsoever, * * *."

Relying upon the above quoted provision in its charter the Company makes these contentions: (1) Its duty with reference to furnishing water for fire fighting purposes is to furnish a supply reasonably adequate for industrial and domestic purposes, and to permit the public authorities, or others fighting fires, to use *that* supply for fire fighting purposes, without any charge to the governmental unit (or the particular individuals using water for such purposes) for the water so used. When it furnishes an adequate supply of water for industrial and domestic purposes and permits its use for fire fighting purposes, its duty has been performed though the supply of water be inadequate for fighting fires. (2) It has the right to add to the rates charged its industrial and domestic consumers an amount sufficient to take care of the cost of furnishing water for fire fighting and to give it a reasonable return on such parts of its property used and useful as is used for, or properly al-

---

[37] For a case in which this court had under consideration some of the provisions of this act, see *Wheat* v. *City Council of Alexandria* (1892), 88 Va. 742, 14 S. E. 672.

locable to, the furnishing of a supply of water for fighting fires.

On the other hand, the City relying upon the above quoted provision of the Company's charter and the provisions of an act approved March 14, 1928 (Acts 1928, pp. 631-3, ch. 200), the material parts of which are carried into Michie's Code Va. 1930, as sections 4073a to 4073f[38] (both included) makes these contentions: (1) The Company is required to furnish a supply of water reasonably adequate for industrial and domestic purposes and also reasonably adequate for fire protection. (2) It is required to do this without any charge to either the city, or other governmental unit, and without any charge to its customers which would not be justified if the Company owed no duty to furnish an adequate supply of water for fire protection and only furnished such a supply as is reasonably adequate for industrial and domestic purposes.

▅ Whatever may have been the proper construction of the provisions of the Company's charter, we are of opinion that the provisions of the act of 1928 constitute a proper

[38] "Section 4073a. Duties of public service corporation engaged in business of furnishing water or sewerage facilities.—It shall be the duty of every public service corporation engaged in the business of furnishing water or sewerage facilities to any city or incorporated town, or any county having a population greater than five hundred inhabitants per square mile, as shown by United States census, in this Commonwealth or to inhabitants thereof (whether or not such business is conducted under or by virtue of a municipal franchise), to furnish at all times and at a reasonable charge a supply of water, a system of distribution or disposal and services and facilities incidental to such supply, distribution or disposal sufficient and adequate to the protection of the health of such inhabitants and to the public health of the community, and a supply of water adequate for proper fire protection within such city or town or such county and the adjacent territory served by the mains of such corporation.

"Section 4073b. Petition of city or town upon failure or refusal of public service corporation to perform duties.—If any such public service corporation shall fail or refuse to perform any of the duties imposed by the preceding section or by this chapter of the Code of Virginia, any city or incorporated town, or any such county served or whose inhabitants are served by such corporation may file with the State Corporation Commission a petition setting forth the failure or refusal of such corporation to carry out and perform one or more of such duties, at a reasonable charge, or to the detriment or threatened detriment of the public health and safety from fire of such community.

exercise of the police power of the Commonwealth; and that it is now the duty of the Alexandria Water Company to furnish a supply of water not only reasonably adequate for industrial and domestic purposes, but also reasonably adequate for fire protection.

The provision of its charter that it shall furnish water for fire-fighting purposes "free of any fee, charge or demand whatsoever" operates to prevent the Company from making a charge therefor to the city or the specific persons using water for such purpose; but it does not operate to prevent the Company from including the cost of such service, and a reasonable return on the property used and useful in furnishing such service, in the amount to be raised by rates charged its customers. The furnishing of water for fire protection without charge therefor to the city, or other governmental unit, is a burden on the Company very much of the same nature as that of an annual local franchise tax; and it must be taken into account in fixing rates to be charged its customers just as a local franchise tax must be taken into account. The effect of this provision is

"Section 4073c. Investigation of complaint by Corporation Commission; finding and orders of Commission.—The State Corporation Commission, after due notice to such public service corporation, shall investigate such complaint and, if upon such investigation, the Commission shall determine that the public health of the community or its safety from fire is impaired or threatened with impairment by reason of the failure of such public service corporation to perform or carry out any of the duties imposed by section one of this act, or by this chapter of the Code of Virginia, it shall embody such finding in an order to be entered upon its records and at the same time shall enter an order requiring such public service corporation to make such increase in its water supply or such increases, changes, modifications and extensions of its distribution or disposal systems, and such changes, modifications and extensions in its service charges and facilities as may be requisite to the proper protection of the public health of the community. The Commission shall fix in its order a reasonable time within which such increases, changes, modifications and extensions shall be completed and may require reports from such public service corporation of the progress of the work so ordered."

Section 4073d provides for dissolution by *quo warranto* proceedings of a corporation failing or refusing to comply with any order of the Commission made in pursuance of this act.

Section 4073e expressly makes the act applicable to corporations theretofore incorporated.

Section 4073f relates to the construction of the act.

to shift the burden of furnishing water for fire protection from the shoulders of the taxpayers *as such* to the shoulders of the industrial and domestic users of water *as such;* and it necessitates the payment by the latter of higher rates than they would have to pay were the cost of furnishing water for fire protection borne by the municipality, just as the imposition of a local franchise tax necessitates the payment of higher rates than they would have to pay were no such tax imposed.

The following quotations from Biggs' testimony shows how he has arrived at his estimate of the percentage of depreciation in the cast iron pipe in the distribution system.

"The useful life of cast iron pipe as pipe is not known. Some engineers have guessed 100 years, some seventy-five, some fifty, some as high as 150; but I don't believe * * * anyone * * * can form any estimate of when any pipe composing the distribution system of Alexandria will pass out of existence or be replaced with new pipe. The cast iron, even of the uncoated pipe, which was laid in Alexandria prior to 1875 shows but very slight evidence of pitting or actual depreciation of the cast iron. An examination of the pipe laid in 1851 and 1853 shows some slight defects and shows some pitting, which might be due to pitting and might be due to manufacture. The tar coated pipe (they started in 1875 dipping pipe in hot asphalt) shows no appreciable pitting either inside or out.

"I have considered, therefore, that if the carrying capacity of the cast iron pipe can practically be restored to the carrying capacity, or practically so, of new pipe, then the cost of that cleaning process fairly represents the amount that should be properly deducted for accrued depreciation using the standard of new pipe as the measure of determining accrued depreciation of the existing pipe."

"I think the pipe in Alexandria must of necessity to keep it in reasonable condition of carrying capacity, be cleaned on the average of every six years. For the pipe that was laid * * * subsequent to January 1, 1925, I have not depreciated to the full cost of cleaning, but have taken aver-

age age of each pipe laid from 1925 to date of inventory and have proportioned the cost of cleaning in the same ratio as the average age bears to six years. * * * In addition to the cost of cleaning I have deducted for all pipe uncoated in the distribution system * * * laid prior to 1865 [sic, 1875] ten per centum of the cost of the pipe and labor for installing it * * ** [because] I am of opinion that the entire carrying capacity of new pipe could not be restored by cleaning." * * * "For additional depreciation, above the cost of cleaning, for all asphalt coated pipe [i. e., all pipe laid since 1875] I have deducted an * * * amount of one per centum[39] as applied to the pipe and labor cost of installing as contained in the reproduction cost estimate. The total amount subtracted for accrued depreciation of the cast iron distributing system * * * is $52,497."[40]

"I do not conceive that there is any functional depreciation in that pipe" * * * [if the four inch pipe is inadequate to meet the normal industrial and domestic demands] "the normal and usual procedure is to reenforce the pipe by laying additional mains to the existing mains. * * * Nobody that I know of removes or abandons cast iron pipe. They reenforce it as the increased consumption and number of consumers require." * * * "Most plants (in communities similar to Alexandria) were largely constructed of four inch pipe." * * * "In this case, where no fire requirements or obligations rest on the water company, four inch pipe is generally large enough for all domestic consumption, now and then." (Matter in brackets inserted by us to preserve witness's meaning.)

Biggs has depreciated the cost of cast iron pipe in place 8.62 per centum for the cost of cleaning and 1.78 per

[39] Testifying further on this point he says: "That one per cent * * * deduction was made for a depreciation I could not actually see. * * * I don't know whether it is there or not. I had allowed it for good measure, but no man, I think can look at that pipe after cleaning and say that the depreciation is as much as one per centum."

[40] Biggs states that $43,494 is for cost of cleaning the pipes and the residue ($9,003) for physical deterioration of the pipes. But to these figures he adds fifteen per centum for depreciation of overhead allowances.

centum for physical deterioration remaining after the pipe is cleaned, making a total of 10.4 per centum.

Williamson and Saville estimate that the composite percentage of depreciation in the cast iron pipe in the distribution system is 34.7 per centum. This they break down as follows:

| Size Inches in diameter | Estimated labor and material cost of reproduction in place | Average age, years | Depreciation, Per Cent | Estimated future service life years |
|---|---|---|---|---|
| 4 | $ 84,675 | 37 | 60 | 30 |
| 6 | 156,792 | 20 | 30 | 40 |
| 8 | 50,396 | 24 | 32 | 50 |
| 10 | 50,152 | 23 | 30 | 50 |
| 12 | 58,940 | 16 | 15 | 80 |
| 16 | 12,974 | 37 | 35 | 80 |
| 20 | 20,924 | 41 | 40 | 80 |
| Specials | 19,357 | 28 | 35 | 60 |
| | $ 454,210[41] | | 34.7 | |

[41] This compares with Milholland's $503,606.

The reasons given by Williamson and Saville for their percentage estimates of the depreciation existing in the cast iron pipe in the distribution system are stated in the following quotations from Williamson's testimony:

"In order to study this system (distribution pipe line system) the deterioration of the carrying capacity with increase in age of cast iron pipe as determined by the Hazen and Williams formula was plotted for each size pipe as a curve, together with the effect of cleaning the mains every six years based on the theory that each cleaning will bring a given section of pipe back to ninety-five per centum of the cleaned pipe immediately preceding any instant operation. The deterioration of carrying capacity and obsolescence resulting from the necessity for reenforcements, therefore, forms the major basis of depreciation."

"The distribution system has a preponderance of four and

six inch cast iron pipe. Out of a total of 303,000 feet, approximately 97,000 feet, or about thirty-two per centum, is four inches, and about 124,000 feet, or approximately forty-one per centum, is six inches. * * * the greater part of the four inch line is in the old city, which contains about three square miles and 20,000 population as compared to four square miles in the annexed territory with about 5,000 population. Serious tuberculation of the pipe is shown throughout the entire system by samples exhibited. * * * The four inch pipe, even if cleaned often, will rapidly deteriorate in carrying capacity to the point where domestic supply adequacy is seriously impaired and this pipe has, as is generally recognized throughout the country, no fire protection value whatsoever. The same is true of the six inch pipe to a lesser degree, of course, but in many instances the six inch pipe acts as feeders for smaller lines in addition to supplying the domestic demand along its route.

"From definite records of the deterioration of cast iron pipe, it can be safely said that its physical depreciation is very slow. It can also be safely said, on the basis of numerous tests, that the carrying capacity of cast iron pipe deteriorates rapidly when handling very soft waters, which are known as "aggressive waters"—like that at Alexandria. The reduction in carrying capacity is due to the formation of tubercules on the interior of the pipe, * * *.

"There can be no question but that cast iron mains can be adequately cleaned to restore them to practically their original capacity and the nature and method of this cleaning has been adequately and correctly described. If cleaning has to be resorted to often—that is, every decade—it is our conviction that each time a tubercule is removed, if it is thoroughly accomplished, that there may and probably does result an increase in the size of the hole through which water originally reached the cast iron. It is either a question of this or the tubercule is not entirely removed and leaves a roughened surface upon which a new formation may readily spring up. The tubercule does not protect the body of the pipe as is shown by the constant increase in

size of these formations; therefore, if a portion of one is left in the barrel of the pipe it will have a better bond than on the slick surface of the coating, will take hold more rapidly and form just as rapidly. Constant cleaning, therefore, we believe will result in ultimate damage to the coating and consequent pitting of the interior surface of the pipe, and we doubt that a given line can be brought back to ninety-five per centum of its original capacity each time that it is cleaned but that the more likely condition is that it is brought back to some per centum less than 100 per centum of its capacity immediately after the previous cleaning. * * *

"Again with the distribution system we are faced with the fact that the increased concentration of population within the cities through apartment houses, large office buildings, hospitals, and the like, has placed an added burden upon the older distribution systems; also the domestic use of water is increasing constantly, and there will come a time when the Alexandria distribution system will have to be reenforced in order to adequately serve the domestic requirements. It is quite probable that the mains now in place will be left there and used in conjunction with reenforced mains, but the mere necessity of the reenforcing mains places a functional depreciation upon the original mains. This is certainly true of the four inch and six inch pipe, and, of course, to a lesser degree in the eight and ten inch sizes, as may be deduced from the following:

"If a four inch main is now inadequate as a result of either growth of demand or deterioration of carrying capacity, or both, and it becomes necessary to reenforce the main, certainly the smallest installation that would be made would be a four inch pipe. Below is tabulated the cost per foot of laying mains from four to ten inches, inclusive:[42]

Four inches..$.91  Six inches..$1.28  Eight inches.. $1.71  Ten inches..$2.16.

[42] Milholland's figures for cost per foot of labor and material to reproduce cast iron pipe in place are: Four inch, $1.03, six inch, $1.59, eight inch, $1.85, ten inch, $2.36.

If, therefore, a four inch main is parallel with a four inch main, the investment per lineal foot is $1.82, whereas the investment for one six inch main would be $1.28 and the carrying capacity of the one six inch main will be one-third greater than that of the combined four inch mains. Proceeding another way, the cost of one foot of six inch line is $1.28. The cost of one foot of equivalent four inch line is three by ninety-one cents, or $2.73—an increase of 213 per centum approximately, to obtain the same carrying capacity to say nothing of the additional maintenance and depreciation which must be allowed.

"Likewise the ratio between eight inch and four inch equivalents are found as follows: Cost of one foot of eight inch line is $1.71. Cost of one foot of equivalent four inch lines—6.3 by ninety-one cents, or $5.73, an increase of 387 per centum.

"Likewise ratios can be found for eight inch and its six inch equivalents and for ten inch and its eight inch or six inch equivalents and so on; in fact, for any size of pipe, and there will be established ratios from 140 per centum up.

"It is simply necessary to consider the comparison between the six inch line and its four inch equivalents in order to determine that much of the four inch pipe in the Alexandria Water Company is obsolete and it logically follows that portions of the six, eight and ten inches are also obsolete to a lesser degree.

"Manifestly, any method of estimating accrued depreciation which does not consider obsolescence in this distribution system cannot be relied upon as setting up a present worth in accordance with the instant facts."

Our conclusions with reference to the percentage of depreciation in the cast iron pipe of the distribution line are as follows:

The existing tuberculation in this pipe is an item of deferred maintenance which depreciates it the full cost of cleaning the pipes; and, accepting Biggs' estimate for cost of cleaning, on this account alone there is 8.62 per centum of depreciation in these pipe lines. It appears to us that

it is not reasonable to assume that the composite average of the actual physical deterioration of this pipe (some of which has been in the ground for seventy-eight years) is only 1.78 per centum of its condition when new. While it is well established that cast iron pipe laid in the ground has a very long physical service life, in a study of this nature it does not appear to us to be reasonable to assume that the actual physical depreciation, observable and unobservable, of these pipes which will remain after they have been cleaned is less than one-fourth of one per centum for each year of their service life. This may be too little, but accepting this as the measure of the physical deterioration which will remain after the pipes have been cleaned, the composite average of such deterioration is 6.3 per centum, and this added to Milholland's allowance of 8.6 per centum for cost of cleaning pipe gives as the total composite percentage of deterioration in all classes of cast iron pipe 14.92 per centum.

The evidence tending to show a functional depreciation in the pipe eight inches and larger due to inadequacy of its size is not impressive. But when the duty of the Company to furnish a supply of water reasonably adequate for fire protection is taken into consideration, we are of opinion that there is a large functional depreciation in the value of the four inch pipe as an element of value in the plant, and that though the functional depreciation in the six inch pipe due to this cause is less than that in the four inch pipe, it is considerable. It is somewhat difficult to estimate this functional depreciation with any accuracy, but it seems to us to be reasonable to estimate it at forty per centum for the four inch pipe and at fifteen per centum for the six inch pipe. This would give approximately 54.92 per centum for the composite depreciation in the four inch pipe, and approximately 29.92 per centum for the six inch pipe, and for the composite depreciation in all the cast iron pipe in the distribution system approximately 26.3 per centum.

Without going into details of our method of arriving at

our conclusion, we are of opinion that a reasonable estimation of the percentage of depreciation in item F-11 (gate valves and boxes) is twenty per centum.

Making use of the percentages of depreciation in the items of group F, of which we have heretofore expressed approval, gives a composite percentage for the group of 26.8 per centum, which is substantially the same as that found by the Commission, which was twenty-seven per centum. We find no error in the Commission's estimate of the percentage of depreciation existing in group F.

We are of opinion that the composite percentage estimate made by the Commission of the depreciation in group C is fair and reasonable.

In group C there are three items (C-3, 5 and 20) which Biggs recognizes are no longer properly included on property used and useful. Milholland's aggregate estimate of the labor and material cost of reproducing these three items is $2,891. Omitting these three items Biggs' composite estimate of the depreciation in the other items of group C is 21.2 per centum and the Commission's 32.58 per centum. Williamson's and Saville's estimates are predicated upon the view that within about five years the present filter house (item C-10, Milholland's labor and material cost $9,816) will be abandoned, and the Cameron pumping station rendered to a large extent useless by the construction of a gravity pipe line from the Barcroft dam to the sedimentation tanks wherever located. The depreciation of this property should not be estimated upon such assumptions. Because of the fact that Williamson and Saville have made their estimates on these assumptions, they are of little assistance in determining the depreciation in the items of this group.

Item C-1, the Cameron station pump house is an old stone and frame mill building, originally constructed in 1790. Milholland's estimate of the labor and material cost of reconstructing it new is $14,563. It has had much reconstruction work done on it, and for a building constructed in 1790 appears to be in an excellent state of preservation;

but Biggs' estimate that the depreciation existing in it is only 17.16 per centum seems to us to be much too small, and that thirty-five per centum is not too large.

The labor and material cost of the reproduction of the boiler house (item C-2) Milholland estimates at $2,109, and Biggs estimates its depreciation at 44.47 per centum. So far as we can ascertain it has no use except to house the steam boiler included in the standby equipment which in our study of group D we find should be depreciated seventy-five per centum. It appears to us that the depreciation existing in the boiler house is approximately the same as that in the boiler.

The office building is a one-story brick building originally constructed in 1911. Milholland estimates the labor and material cost of reproducing it at $15,651, and Biggs estimates the depreciation in it and its fittings to be 10.09 per centum. Williamson and Saville estimate its depreciation as thirty per centum, and its future service life at fifty years. The details of Milholland's estimate show that it includes $1,800 for marble trim for window sills, water table, and entrance, and $552 for stucco blocks for corner trim. That is, approximately fifteen per centum of the cost of the labor and material for the building is for ornamentation of this type, which is a matter of taste and mode and tends to become out of fashion. The cost of plumbing and heating fittings and fixtures are estimated at approximately $1,000. When all the evidence bearing upon the depreciation of this building is considered, we are of opinion that an estimate of depreciation in its value at twenty per centum would not be too large.

The Commission's composite percentage depreciation estimate for group D as a whole is forty-seven per centum. The comparable estimates of the witnesses are, Biggs 25.8 per centum and Williamson and Saville 69.3 per centum.

Williamson's and Saville's estimates of the depreciation in the pumping equipment are predicated upon the view that within the very near future a gravity pipe line should be laid from the Barcroft dam to the sedimentation tanks;

that this would render all the equipment at the Cameron pumping station and the pipe lines from there to the sedimentation tanks to a large extent merely standby equipment; that the steam power units and the Diesel oil units would constitute the duplicate units actually used; and that the water power units would be practically useless and worthless. The Commission took the view (correctly we think) that the evidence is not sufficient to warrant it in valuing this property on the assumption that a pipe line should be laid from the Barcroft dam to the sedimentation tanks. This renders the depreciation estimates of Williamson and Saville inapplicable wherever this theory has entered into their estimates. As will be seen hereafter, we are of opinion that the water power pumping units and the Diesel oil units are to be regarded as providing necessary duplicate pumping equipment, and the steam pumping units as purely standby equipment.

When we come to examine Biggs' estimates of depreciation of the pumping equipment we find them too low. There is in this group, in addition to physical deterioration, material functional depreciation.

The steam pumping equipment at the Cameron station is an example of equipment whose value as a factor of the value of the plant as a whole has materially depreciated, because of changes in methods of operation which have been or are in the process of being made, or are in immediate contemplation, or must or should be made in the near future. In the instant case the change had actually been made at the time the evidence was taken.

When the Milholland inventory was made as of March 1, 1930, there were in use at the Cameron run pumping station two classes of pumping units, (a) two water power driven pumps and (b) two steam power driven pumps. As we understand the testimony, while at times there is insufficient water to operate the water driven equipment, the units then in place were fully adequate to do all the pumping required by the Company, including the furnishing of standby or substitute pumping equipment in case some of

the units could not be used. The two classes with the Company's reproduction new cost of the steam units, the dates of their installation, and Biggs' percentage estimates of the physical deterioration therein are as follows:

(a) Water driven units:

Unit D-1, Morris pump (1851) and Fitz overshot water wheel (1902) having a capacity of 1,000,000 gallons per day.
Unit D-3, Delaval water turbine and centrifugal pump (1928) capacity 950 gallons per minute or 1,370,000 gallons per day.

(b) Steam driven units:

| | | |
|---|---|---|
| D-7 Scotch marine boiler (1928).....$ | 2,990 | 6.7% |
| D-2 Smith-Vail compound pump (1898) capacity 1,500,000 gallons per day.. | 3,502 | 22% |
| D-3 Delaval centrifugal pump, steam turbine drive, with condenser (1928), capacity 3,000,000 gallons per day.. | 4,124 | 7.1% |
| D-5 Erie city boiler (1900) .......... | 4,369 | 100% |
| C-3 Brick chimney (prior 1864) ..... | 2,622 | 100% |
| Totals for class ..............$ | 17,607 | 46.87% |

As of September 30, 1930, the Company put into service at the Cameron station a third class of pumping units, i. e., two Diesel oil engine centrifugal pump units. One of these pumping units has a capacity of 1,000,000 gallons per day and cost $9,019.[43] The other has a capacity of 3,000,000 gallons per day and cost $12,303. The Company's witnesses testified that by using the Diesel oil engine units instead of the steam units, the annual operating expense of the Company would be reduced approximately $3,216. Since the installation of the oil driven pumps the steam pumps have been, and will hereafter be, used only for standby service. The Company's witness Freer estimated that during the year 1931 the Company would pump from the Cameron station approximately 814,000,000 gallons of water, of which 220,000,000 gallons would be pumped by water driven units, and 594,000,000 gallons by oil or steam driven units, and that of the latter ninety-five per centum would be

---

[43] These costs are exclusive of auxiliary pipes, fittings, etc., for the two units, which amounted to $1,867.89.

pumped by oil and five per centum by steam. That is, only 3.65 per centum of the total water pumped would be pumped by steam equipment.

As we understand the operation of the plant, approximately 1,000,000 gallons per day of raw water is pumped through the eight inch main. This main leads from the Cameron station to both the sedimentation tanks and to the Southern railway yards. This pumping is usually done with the Morris water power pump or the smaller of the two Diesel oil engine pumps. Any water pumped by these pumps which is not consumed by the Southern railway is delivered to the sedimentation tanks and goes from there into the reservoirs. About 2,250,000 gallons per day (the peak to date being approximately 2,730,000 gallons) is required for general distribution service. Most of this is pumped through the twelve inch main leading from the Cameron station to the filter plant by either the water turbine pump, the steam turbine pump, or the larger of the Diesel oil engine pumps. The three reservoirs in the distribution system have an aggregate storage capacity of 17,200,000 gallons, which is more than five days' supply under peak conditions, and more than seven days' supply under any normal condition even in the summer.

The evidence shows that the oil driven units were installed because it cost materially less to operate them than to operate the steam pumps, and not because the steam pumps were or were becoming inadequate to render the required service; and it does not show that, if in 1930 the oil driven units had been in place instead of the steam driven equipment, either the company or good engineering practice would have accounted it necessary, expedient or particularly desirable to install any of the steam power equipment (or any substitute therefor) as standby equipment. The chief reason, so far as we can gather from the evidence, for retaining the steam equipment as standby equipment is that it is there, and the chief reason for using it appears to be to keep it in condition for use. It appears to us to be very doubtful where any person or Company

desiring to purchase and operate the Company's plant would, after the installation of the oil driven units, consider the steam equipment as adding appreciably to its service fitness or monetary value.

Biggs, Williamson and Saville all treat the boiler (D-5) and the chimney (C-3) as now wholly not used and useful, even as standby equipment, and their depreciation as 100 per centum. The other three items of steam power equipment Biggs depreciates only for physical deterioration, though he bases his estimate of the physical depreciation of the boiler (D-7) on its age rather than on observation. His percentage of depreciation on the three items considered as a unit is 11.88 per centum. We are of opinion that as elements of value in this plant these three units are not worth more than twenty-five per centum of their reproduction new cost, that is, that there is seventy-five per centum depreciation in them. Of course, the reproduction new cost of these items is the same and their physical deterioration is the same as it would be if these oil driven units had not been installed; but their value as a factor of the value of the plant as a whole is not the same. Cost less physical deterioration is not value, though it is of evidential worth in determining value, and under some circumstances may give a figure which coincides with value.

The item D-1, Morris reciprocating pump (1851) and the Fitz overshot water wheel (1902), is the only item (not wholly charged out) in which Biggs finds that there is obsolescence. His method of estimating the accrued depreciation existing in this item is novel. Milholland estimates the reproduction new cost of the pump installed at $3,400, of the water wheel installed at $2,672, and of the foundation for them at $2,412, making a total of $8,484. Biggs testifies that the pump is not now manufactured by any manufacturer and is obsolete. The cost of putting the pump, water wheel and foundations in condition "good as new," by replacing parts (*i. e.*, doing much the same thing that is done when an old typewriter is rebuilt) he estimates to be $2,047. This deducted from Milholland's re-

production new cost estimate leaves $6,437. But he testified that were this unit (D-1) to be replaced it should be replaced by a water turbine pump unit, and that such a unit of the same efficiency and capacity as unit D-1 installed would cost $4,500, exclusive of overheads. He assigns to the existing unit after it has been overhauled and rebuilt the same value as the new unit installed. In this way he arrives at the conclusion that the depreciation in the old unit is $3,984 (which is forty-seven per centum of Milholland's reproduction new cost thereof).

We find ourselves unable to reach the conclusion that, when this old, obsolete unit has been furbished up to look like new, and rebuilt and reconditioned so that it will (for a time at least) render as good service as a new and modern unit would do, it will have a value equal to that of a new, modern unit of the same capacity and efficiency. Taking into consideration that the existing unit requires somewhat less water for its operation than would the new unit, we are of opinion that it would be eminently fair to the Company to treat this unit as having a present fair value equal to sixty-five per centum of the cost of a new, modern unit, that is a value of $2,925. This is equivalent to depreciating Milholland's reproduction new cost of the old unit 65.5 per centum.

Of the cast iron raw water mains (item D-13) about twenty per centum (based upon Milholland's reproduction new cost figures) has been in place for about eighty years, thirty-two per centum for about fifty-five years, and the other forty-eight per centum for an average of fifteen years or more. Biggs' estimate of a composite depreciation percentage (twelve per centum) for this item is in our opinion too low. In estimating the depreciation of this item he seems to have used much the same method he has used in depreciating the cast iron pipe in the distribution system (items F-7 and 8). The evidence does not show to what extent these raw water mains have become tuberculated or what the cost of cleaning them would be. But in view of the testimony with reference to the condition of the dis-

tribution mains, it would appear to be reasonable to infer that the raw water mains are tuberculated to an extent which has materially reduced their capacity. Taking this and all other elements of depreciation disclosed by the record into account, we are of opinion that Biggs' percentage of depreciation in these lines is too low, and that there is approximately fifteen per centum depreciation in them.

The evidence requires, we think, a modification of Biggs' estimates of the depreciation in some of the other items of this group. Making these modifications and using the depreciation percentages above approved by us for application to the items mentioned, we get for the composite depreciation in group D approximately 41.7 per centum. We are of opinion that the Commission's estimate of the depreciation in this group is too large by the amount it exceeds forty-two per centum. Expressed in dollars it is approximately $3,000 too large.[44]

Williamson's and Saville's estimates of the depreciation existing in group E (the purification system) are dominated by the theory that this system should be abandoned at an early time, and a new system installed at some place having a higher elevation. Biggs' estimate of fifteen per centum as the depreciation existing in this group is too low, but upon a careful examination of the several items in this group, and the evidence bearing upon the depreciation existing therein, we are unable to find sufficient support for the Commission's figure thirty-five per centum. In our opinion twenty-five per centum is much nearer the correct figure, and we find the Commission's percentage too large by the amount it exceeds that percentage. Expressed in dollars we find that the Commission's dollar depreciation is approximately $5,600 too large, on account of its excessive estimate of the depreciation in group E.

The Commission's estimate of the depreciation in group G we find to be approximately correct.

As we have heretofore indicated, we think that the Com-

[44] That is, the figure $365,746 in Table II, item 7, column 4, is $3,000 too large on that account.

mission was correct in refusing to allow the item of $19,000 for preliminary and organization expense in addition to the overhead allowances made by it.

This brings us to that always troublesome item "going concern value." No little of the suspicion with which the public regards requests for rate increases, we think, is due to the inclusion in rate bases of allowances, sometimes large, for intangible values such as "going concern value." While as an item of sales value it is present in all successful and well managed businesses, yet it is not an item which in figuring rate of return the public is accustomed to regard as *capital.* Were a bank statement, for instance, to come out with the item "going concern value" in its asset column, it would arouse immediate distrust, even though it may have been for years reflected in the increased rate of return on capital assets.

It is obvious that from the standpoint of a purchaser the property of a public service company which is serving a developed territory and is running smoothly is worth more than a new development of equal capacity; but this is so largely because of its better earning capacity; and we think it would be far better to reflect this increased value in the rate which a utility is permitted to earn than in its rate base. But it is now established as a matter of law that, in considering whether a prescribed schedule of rates is confiscatory, "going concern value" must be, directly or indirectly,[45] included as a *property right* in the value of the property upon which a utility is entitled to a return.

In *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 165, 59 L. Ed. 1244, 35 S. Ct. 811, 815, the Supreme Court of the United States says: "That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property upon

[45] *Dayton P. & L. Co.* v. *Public Utilities Comm.,* 292 U. S. 290, 78 L. Ed. 1267, 54 S. Ct. 647.

which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use." For three later cases which temper to a material degree prior utterances of the court with reference to "going concern value" see *Los Angeles Gas, etc., Co.* v. *R. R. Comm.*, 289 U. S. 287, 77 L. Ed. 1180, 53 S. Ct. 637; *Columbus Gas & Fuel Co.* v. *Public Utilities Comm.*, 292 U. S. 398, 78 L. Ed. 1327, 54 S. Ct. 763, 91 A. L. R. 1403; and *Dayton P. & L. Co.* v. *Public Utilities Comm.*, 292 U. S. 290, 78 L. Ed. 1267, 54 S. Ct. 647.

The Company claims that the "going concern value" of its properties is $150,000. This figure is arrived at by the witness Biggs in this way. He assumes that the territory served by the Company exists in its present state of development, but is without a water supply; that the Company begins the production of a plant which is the exact duplicate of its plant now in existence; that with the exception of the services and perhaps a few of its outlying mains, it completes its plant in two years; and that it takes it four years after construction is begun to acquire all its present customers. He then estimates what an annual return of seven per centum on the amount of the Company's investment would be for each of the four years following the beginning of construction, and what the gross income (*i. e.*, gross earnings less gross expenses) would be for each of the four years. According to his estimates during the four years the Company's aggregate gross income would be $156,133 less than the Company would have received had it earned an annual return of seven per centum upon its investment. This he terms "going concern cost," which he testifies approximately measures or represents the "going concern value" of the plant. This figure adjusted to $150,-000 is what the Company claims is the "going concern value" of its property. We do not concur in this view.

Neither the historical cost of establishing the business nor the amount by which a company during its early years fails to earn a reasonable return on its investment is

its "going concern value" or a yardstick by which it can be measured.

As is said by Mr. Justice Brandeis in delivering the opinion of the court in *Galveston Elec. Co.* v. *Galveston,* 258 U. S. 388, 66 L. Ed. 678, 42 S. Ct. 351, 354: "The fact that a utility may reach financial success only in time or not at all is a reason for allowing a liberal return on the money invested in the enterprise;[46] but it does not make past losses an element to be considered in deciding what the base value is, and whether the rate is confiscatory. A company which has failed to secure from year to year sufficient earnings to keep the investment unimpaired and to pay a fair return, whether its failure was the result of imprudence in engaging in the enterprise, or of errors in management, or of omission to exact proper prices for its output, cannot erect out of past deficits a legal basis for holding confiscatory for the future rates which would, on the basis of present reproduction value, otherwise be compensatory. * * * *Past losses obviously do not tend to prove present values.*"

▮ Viewed as a property right for which allowance must be made, directly or indirectly, as an element of the aggregate value of the Company's property used and useful in the performance of its public functions and included in its "rate base," "going concern value" is the value added to the bare physical value of the plant, as an inherent element thereof, by reason of the fact that the plant is in successful operation, rendering adequate and efficient service, with customers secured and business established.

▮ In determining "going concern value," it is important to bear in mind that neither the value of the good will[47] of the owner of a public utility property, nor what it would be worth to a purchaser to have the owner removed as a competitor, nor the *value* to the owner or a

---

[46] This would appear to be a reason which is addressed to the legislative discretion of the rate regulating body; and not to the judicial discretion of a court.

[47] *Los Angeles G. & E. Corp.* v. *R. R. Comm.,* 289 U. S. 287, 77 L. Ed. 1180, 53 S. Ct. 637, 644.

purchaser of the public franchises held by the owner (in excess of the amount, if any, paid by the original recipient to the government therefor), is a proper element of a rate base; and that they may not properly be weighed into or reflected in the rate base of a company by giving them weight as factors in determining the "going concern value" of its property. In the instant case the Alexandria Water Company received its local franchise as a gift, that is, it paid nothing therefor.

The determination of "going concern value" is largely a matter of sound judgment, and, taking all the facts disclosed by the record into consideration, we are of opinion that the Commission's estimate of the "going concern value" of this Company's property is fair and reasonable.

As we have heretofore indicated, we are of opinion that the Commission's estimate of accrued depreciation is approximately $50,600 too large. When correction is made for this, the Commission's estimate of reproduction new cost less depreciation of the Company's physical properties as of March 1, 1930, plus net additions and betterments to December 30, 1930, plus materials and supplies, working capital, and "going concern value" is raised to $1,433,237, which we are of opinion is under the evidence approximately correct.

The records bearing upon the historical book costs of this property are very unsatisfatcory, particularly those for years prior to 1906, and do not present any reasonably satisfactory bases for deducting present value. As best it can be gotten from the records the undepreciated book costs of the property from 1851 to December 31, 1930, less retirements actually charged off, is $1,082,024.01, which was accrued as follows:

| | |
|---|---:|
| March 10, 1851, to May 31, 1893 (of which $91,994.17 was for pipe lines) .............................$ | 172,905.40 |
| June 1, 1893, to Oct. 31, 1906 (of which $34,606.13 was for pipe lines) ................................. | 103,699.27 |
| Nov. 1, 1906, to Oct. 31, 1912 (of which $34,926 was for pipe lines and appurtenances) .................. | 61,469.45 |

Nov. 1, 1912, to June 30, 1915 (of which $185,963.81 was for construction of Barcroft dam and $9,859.73 for pipe lines and appurtenances) ..................$   205,622.98

July 1, 1915, to June 30, 1916 (of which $45,750 was for Barcroft dam and $5,380.13 for pipe lines and appurtenances) ..................................   56,710.57

July 1, 1916, to June 30, 1917 (of which $4.50 was for pipe line) ......................................   1,999.60

July 1, 1918, to June 30, 1929 (of which $233,102.24 was for pipe lines and appurtenances) ...............   436,230.70

$ 1,038,637.97

Less deduction of credits Nov. 1, 1906-June 30, 1929....   13,404.73

$ 1,025,233.24

July 1, 1929, to Dec. 31, 1930, net additions and betterments (of which $19,285.42 was for distribution main) ......................................   56,790.77

$ 1,082,024.01

An examination of the inventory and reproduction new cost studies shows that something like sixty-six per centum of the reproduction new cost of property other than land is for items of property installed prior to June 30, 1916, while only about forty-five per centum of the book cost was accrued prior to that date, and that forty-five per centum includes the cost of practically all the land and rights of way owned by the Company.

The book costs include the purchase price of tracts A and B of the Company's land and the other items of property heretofore mentioned as having been held by the Commission to be not used and useful. The Commission estimated the cost of the property it held not used and useful as having been $33,871.09. It deducted this and also 24.7 per centum of the cost of the other property (exclusive of land and rights of way) for depreciation, and thus arrives at the conclusion that the book cost of the property, less accrued depreciation as of December 31, 1930, was $817,-559.28.

However, before the book cost, depreciated or undepreciated, can be of any material assistance in determining present fair value of a property it is necessary to have some idea of how the price levels of the dates of construction or

acquisition of the items of the property compare with the price levels obtaining at the time the valuation is being made.

The Company through its witnesses introduced diagrams (or curves) showing the trend of construction cost, water works construction cost, labor cost, and cost of cast iron pipe from 1913 to December 31, 1930, taking the 1913 cost levels as bases. From these curves it appears that the book costs of property installed or acquired (other than lands and rights of way) from April 1, 1917, to December 31, 1930, if correctly entered, aggregates somewhat more than the cost of reproducing the same property in 1930, and that the trend of the cost of construction during 1930 was downward. But the evidence is not sufficient to enable one to prepare a reasonably accurate statement of the several installations with their costs adjusted to 1930 price levels.

These construction cost curves tend to show that to reproduce in 1930 pipe line laid in 1913, 1914, 1915 would have cost approximately 127 per centum of its cost when installed; and that general construction of the type of the Barcroft dam would have cost to reproduce in 1930 over 200 per centum of its cost when installed. This seems to be borne out by a comparison of the actual cost of the Barcroft dam with Milholland's and Williamson's estimates of the bare labor and material cost to reproduce it new in 1930. The actual cost of the dam was $232,103.76. From the testimony of the Company's witnesses this appears to be labor and material cost plus about ten per centum for engineering, which would leave its bare labor and material cost about $210,003. The labor and material cost of reproducing this dam is estimated by Milholland at $449,839, which is approximately 214 per centum of $210,003. Williamson estimates it at $440,861 which is approximately 210 per centum of $210,003.

The book cost of the distribution mains and the raw water mains is $428,980.06. This apparently includes gate valves and services, though this may not be so. Milholland's estimate of the cost to reproduce the distribution mains, raw

water mains, gate valves and services is $550,207, and Williamson's and Saville's $522,736. This would seem to indicate that Biggs was of opinion that the composite cost of reproducing these items was approximately 128 per centum of their book cost as recorded, and Williamson and Saville of the opinion that it was about 122 per centum. But it must be remembered that it is not clear that the figures above compared are in all respects comparable.

A general, though very imperfect, idea may be gotten of the comparative cost of construction done in years prior to 1913 and of construction done in 1930, by comparing the book cost of reservoirs No. 1 and No. 2 with the witnesses' estimates of the labor and material cost of reproducing them in 1930:

|  | Date constructed | Book cost as recorded | Labor and material cost to reproduce in 1930 | |
|  |  |  | Milholland | Williamson |
|---|---|---|---|---|
| Reservoir No. 1 | 1852 | $ 17,114 | $ 41,144 | $ 26,782 |
| Reservoir No. 2 | 1875 | 22,633 | 50,927 | 29,309 |

The Barcroft tract which was acquired during the period 1903-6 cost the Company between $60,000 and $65,000. The Commission excluded 264 acres (tracts A and B) of this land as not being used and useful. The lowest value placed upon tracts A and B by any of the witnesses was $52,100, and the Company's witnesses place its present value at much more. The Commission found $100,000 as the present fair value of the residue of the tract.

It is also to be noted that much the largest part of the depreciation existing in the plant is in property installed prior to 1913. This renders the composite depreciation percentage applied by the Commission to the reproduction new cost (or that percentage modified to accord with the views heretofore expressed) inapplicable to book cost until it has

been adjusted to reflect 1930 price levels. Further, upon what theory the Commission deducted for depreciation 24.7 per centum of the net book cost (amounting to $56,790.77) of additions and betterments added from July 1, 1929, to December 31, 1930, is not apparent. These additions and betterments were not included in the property for which 24.7 per centum was estimated as a composite depreciation percentage.

There is another very material line of evidence bearing on the present value of the Company's property which seems to have been given little weight by the Commission, if indeed it was given any weight. The American Water Works and Electric Company is a holding corporation which owns and operates through its stock ownership a large number of water companies. As of July 1, 1929, it purchased from the stockholders of the Alexandria Water Company all its capital stock (4,000 shares of the par value of $50 each) at $300 per share, plus a sum which was to be determined by the amount that the current assets of the Company exceeded its current liabilities. This last amount was ascertained to be $30,794.47. The total price paid for the stock was $1,230,794.47. At the time of this purchase the Alexandria Water Company had, and still has, outstanding $400,000 of five per centum notes secured by a mortgage on its physical properties.

Though this transaction was in form a stock sale and purchase, it was in substance a purchase of the local franchise to conduct a water company business in and adjacent to the city of Alexandria and all the property and business of the Alexandria Water Company at $1,630,794.47, of which $400,000 was paid by the assumption of the mortgage.

The general rule is that the aggregate value of the stocks and bonds of a company as determined by the prices at which they are being traded in should not be considered in determining the fair value of the Company's property used and useful in the performance of its public service functions and duties. But this rule is not properly applicable to a purchase such as this of all the stock of a cor-

poration at one time, or practically one time. Such a sale has practically the same evidential value as if the property transferred by the stock sale (other than the mere franchise to be a corporation) had been transferred by a regular conveyance thereof. The court will look through the form to the substance of the transaction.

The Commission appears from its opinion to have taken the view that, as this was in form a stock sale, it could not properly consider it in determining the present value of the property of the Alexandria Water Company. At least we find nothing in its opinion to indicate that it gave it any consideration. If this was its view, it was in error in this particular.

We have here a sale fairly made by a seller (who is willing but not forced to sell) to a purchaser ready and willing to buy, who is in the market for the purchase of such properties, and is under no compulsion by reason of competitive conditions. The purchase price paid in such a sale is not conclusive of the value of the property bought, but it has much the same relevancy to the question of value that the purchase price recently paid for a parcel of land has in a proceeding to condemn it for a public use. If it be shown that the purchaser paid more than its fair value, it is not entitled to a return on the excess paid over and above its fair value. If on the other hand it has paid less than its fair value for the property, the fact that it has bought a bargain does not bar it from the right to a fair return on the fair value of the property bought.

However, the price paid was a lump sum price and covered certain items which are not properly included in the rate base of the Alexandria Water Company. It covered (1) the franchise right to be a corporation; (2) the local franchise right to occupy the streets, alleys, and roads of the city of Alexandria and adjacent territory; (3) the amount by which (a) current assets exceeded (b) the current liabilities plus working capital reasonably necessary; (4) the purchase price of tracts A and B; (5) certain other physical properties which the Commission has

held not to be used and useful in the performance of the public service functions and duties of the Alexandria Water Company; and (7) certain items of property which the Company recognizes have become since its purchase not used and useful and has treated as having depreciated 100 per centum.

The bare franchise right to be a corporation is, under the laws of Virginia relating to corporations, of little, if any, greater value than the cost of incorporating a like corporation, including the charter fee required by section 205 of the Tax Code (Code 1930, Appendix, page 2184), which for a public service corporation having a maximum capital stock of the par value of $200,000 is $325. The record contains no evidence as to the other cost of incorporation, and we shall not make any conjecture as to what they would be.

The charter of the Alexandria Water Company was granted by an act of the General Assembly passed March 13, 1850 (Acts 1849-50, pp. 145-6), which granted it the franchise to occupy "the streets, lanes, alleys and public squares in said town for the purpose of laying pipes for distributing water." Though its charter has been amended since the Constitution of 1902 was ordained, under the authority of *Commonwealth* v. *Portsmouth Gas Co.*, 132 Va. 480, 112 S. E. 792, its franchise to occupy the public streets, etc., of the then town, now city of Alexandria, is a perpetual franchise, which cannot be revoked or annulled so long as the Company observes the conditions under which the grant was made. When it is considered that section 125, Constitution of Virginia, expressly prohibits the granting of such a franchise for more than a period of thirty years, it at once becomes evident that the franchise of this Company is a valuable asset. There is no evidence from which the value assigned by the purchaser to the franchise can be determined with any accuracy; but a court or commission would be blind indeed which did not know beyond contravention that it is an item of no small monetary value. It is a fair inference that its existence had a material bearing upon the price paid by the American Water Works and

Electric Company for the stock of the Company; and we think it would not be unfair or unreasonable to assume that it added as much as $100,000 to the price the purchaser was willing to and did pay.

As to the third item the evidence introduced by the Company shows that approximately $20,000 of the $30,794.47 by which current assets exceeded current liabilities was cash in bank, and that in 1930 a dividend was declared to withdraw from the treasury of the Company either all or at least the larger part of this cash. According to the Company's witnesses, the aggregate working capital (including inventory of supplies and materials) needed by the Company is $1,600. Assuming (though the evidence does not so show) that supplies and materials on hand were included in the figures from which the $30,794.47 item was computed, $29,194.47 thereof represented property not used or useful in performing the public service functions of the Company.

As the Commission excluded tracts A and B from the rate base, it made no finding as to the value of these two tracts. The City's witnesses valued them separately from the residue of the Barcroft tract. The aggregate values assigned by them to these two tracts ranged from $52,100 to $59,400, the average being $54,400. The Company's witnesses made no separate appraisal of these two tracts; but the Commission, by a process of reasoning which we think is fair to the Company, found that the aggregate value assigned by the Company's witnesses to these two tracts were as follows: Witnesses Kane and Graham $93,341, witness Jones $71,640, witness Church $68,135. Witnesses Kane and Graham testified the value assigned by them to the lands of the Company was determined by them when they appraised the property for the American Water Works and Electric Company in 1928, at which time it was considering purchasing the Alexandria Water Company; and that the property was worth as much in December 31, 1930, as it was in 1928. Witnesses Jones and Church made their appraisal in April, 1931, after the existing depression had been in

evidence for about eighteen months and had had time to register its effect upon values. After considering all the evidence bearing on the point, we are of opinion that in deducting from the purchase price paid by the American Water Works and Electric Company the fair value of the Company's property used and useful as of December 31, 1930, it would be eminently fair to the Company to assign to the purchase price of these two tracts the average aggregate values assigned to them by the Company's witnesses $77,705.

There are two other items of land owned by the Company on July 1, 1929, which the Commission has held on plainly good grounds to be not used or useful. They are items A-11 and A-12. In its inventory and appraisement the Company values as of June 30, 1930, item A-11 at $6,500, and item A-12 at $3,690. Item A-11 is a lot on Cedar street with a residence thereon which is rented out. The Company's witnesses testify that they appraised this lot at $6,500 in 1928 and it is still worth that amount. Item A-12 is a right of way purchased for a pipe line from Barcroft dam to the filter plant, but the Company has abandoned the idea of putting in such a pipe line.[48] The value assigned to it is the amount paid for it.

The Commission also upon good grounds found that three residence buildings on the Barcroft reservoir 949.37 acre tract, which are rented out by the Company, are not used and useful in the performance of its public service. The average value placed upon these three buildings by the Company's witnesses is $7,100; and they appear to give this as being their value both in 1928 and 1930. The average value placed thereon by the City's witnesses is $8,016.

From the evidence introduced by the Company it appears that certain items of property which were in use on July 1, 1929, are no longer used and useful, though they have not been charged off on the books. These items and their re-

[48] In support of the propriety of deducting this item, see *Columbus Gas & Fuel Co.* v. *Public Utilities Comm.* (1934), 292 U. S. 398, 78 L. Ed. 1327, 54 S. St. 763, 91 A. L. R. 1403.

production cost new as testified to by Company witnesses
are:

| ITEM | Company's reproduction cost new |
|------|---------------------------------|
| B-7—Well, Belle Haven station............................... | $ 1,100 |
| D-25—Deep well pumping unit, Belle Haven station...................................................................... | 429 |
| D-22—Pumping unit, Seminary station.................... | 933 |
| C-5—Blacksmith shop.................................................. | 175 |
| C-20—Fence................................................................... | 94 |
| | $ 2,761 |
| Plus 15 per cent overheads added by Company.... | 414 |
| | $ 3,175 |

The net additions and betterments (before any deductions are made for the retirement of the items above mentioned) added July 1, 1929, December 31, 1930, amounted to $56,790.77. In any attempt to find their fair value as of December 31, 1930, using the purchase price of July 1, 1929, as a base, the net additions and betterments must be added, but on the other hand the items retired from use which are above listed must be deducted. It is not possible from the evidence to determine with accuracy the amount which, in such a computation, should be deducted for these retirements; but when all the evidence which has any bearing on this point is considered we are of opinion, and so find, that a deduction for these items of $1,500 would be eminently fair to the Company.

It would seem to be fair and reasonable to conclude that the price paid on July 1, 1929, by the American Water Works and Electric Company for so much of the property of the Alexandria Water Company as the Commission has held is properly included in the rate base of the latter Company, plus additions and betterments since that date was approximately $1,461,520.77. This figure is the price paid for the property used and useful valued as those of a going

concern, that is, it includes whatever was paid for "going concern value"[49] and is derived from this computation:

| | | | |
|---|---|---|---|
| (a) | Price paid for stock | | $1,230,744.47 |
| (b) | Outstanding secured notes, in effect, assumed | | 400,000.00 |
| (c) | Total actual price paid for whole property | | $1,630,744.47 |
| (d) | Deduct for bare corporate franchise in excess of | $ 325.00 | |
| (e) | Deduct for excess of current assets over necessary working capital and current liabilities | 29,194.47 | |
| (f) | Deduct for Tracts A and B of land | 77,705.00 | |
| (g) | Deduct for other lands and right of way not used and useful | 10,190.00 | |
| (h) | Deduct for three buildings on that part of Barcroft tract not excluded | 7,100.00 | |
| (l) | Deduct for retirements not charged out | 1,500.00 | |
| (j) | Deduct for local franchise | 100,000.00 | 226,014.47 |
| (k) | | | $1,404,730.00 |
| (l) | Add gross additions and betterments 7/1/29-12/31/30 | | 56,790.77 |
| | | | $1,461,520.77 |

There is, however, another factor which must be taken into account in attempting to deduce the fair value of this property as of the date of the Commission's order from the price paid for it on July 1, 1929, or from the reproduction new cost studies made by the several witnesses. That is, the world-wide depression which began in the fall of 1929 and still continues.

There is nothing to indicate that the American Water Works and Electric Company when it made its purchase in July, 1929, had been able to foresee and take into account the great fall in values which have since occurred. The unit prices used by the witnesses in this case were compiled during 1930, and may reasonably be regarded as having taken into account the fall in prices which had occur-

---

[49] For a case dealing with the treatment of going concern value where the assets of a company have been valued on the basis of their being assets of a plant in successful operation, see *Dayton Power & L. Co.* v. *Public Utilities Comm.* (1934), 292 U. S. 290, 78 L. Ed. 1267, 54 S. Ct. 647.

red up to December 31, 1930, but it is a fair inference that they do not give any weight to the fact that the trend of price levels was downward. But it is a matter of common knowledge of which courts should take cognizance that, generally speaking, prices and values receded still further during 1931. Taking this into account and the fact that reproduction new costs less depreciation estimates are at best to a material extent conjectural,[50] and the evidence shows that price trends were downward at the time the taking of evidence was closed, we are of opinion that the Commission would have been warranted in having found $1,350,000 as the fair value of the Company's property used and useful, but that a figure materially less than this is an undervaluation of the property.

As reiterated by Chief Justice Hughes in *Los Angeles G. & E. Corp.* v. *R. R. Comm.*, cited in footnote 47, "the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory 'is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts.' "

The Company takes exception in only two particulars to the Commission's estimate of the net return to it from the rates prescribed. These two particulars are set out in its assignments of error designated by us as 3a and 3b.

We are of opinion that the evidence does not justify the Commission in having refused to allow the $4,500 of office expense which is the subject of assignment of error 3a.

After a careful examination of the evidence we are of opinion that the expense allowance made by the Commission for annual depreciation is fair and reasonable.

We do not concur in the contention of the Company that, in determining the amount which should be allowed the Company as an expense item for annual depreciation, the Commission must base its estimate upon the present fair

[50] See a recognition of this fact in *Los Angeles G. & E. Corp.* v. *R. R. Comm.*, 289 U. S. 287, 77 L. Ed. 1180, 53 S. Ct. 637; *St. Louis & O'Fallon Ry. Co.* v. *U. S.* (1929), 279 U. S. 461, 73 L. Ed. 798, 49 S. Ct. 384.

cost of replacement of the property, *i. e.,* its reproduction new cost. In *United R. & E. Co.* v. *West,* 280 U. S. 234, 253-4, 74 L. Ed. 390, 411, 50 S. Ct. 123, the Supreme Court of the United States seems to have taken the view contended for by the Company. But the pronouncement of the court in that case has been overruled inferentially (at least) in *Lindheimer* v. *Ill. Bel. Tel Co.* (April, 1934), 292 U. S. 151, 78 L. Ed. 1182, note 1, 54 S. Ct. 658, 665, 669. In that case Chief Justice Hughes defined the annual allowance for depreciation as "an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered," and the court sustained a depreciation allowance computed on the original cost instead of present replacement cost.

The Commission estimated the net annual return to the Company from the rates prescribed by it to be $73,764. Adjusting for the expense item of $4,500, which we think the Commission was not warranted in disallowing, the net return of the Company from the rate prescribed by the Commission is approximately $67,264, which is 4.98 per centum of $1,350,000.

As was said in *Los Angeles G. & E. Corp.* v. *R. R. Comm., supra,* "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." It is a matter of common knowledge that, under the depressed business conditions which have existed since the early part of 1930, the end of which has not yet come and cannot be predicted with any confidence, a company (whatever its business) which has been able to earn a net return of as much as 4.98 per centum upon the present value of its property used and useful in the business has been very fortunate, and that few companies have been able to do so. In view of this fact we are of opinion that it cannot be said with reason that the prescription of rates for a public utility company which yield to it a net return of 4.98 per centum is, in effect, a

confiscation of its property, or deprives it of its property without due process of law.

We are mindful of the fact that the Commission in its opinion expresses the view that "5.3 per centum is not a fair and reasonable return" upon the Commission's valuation of $1,150,000 and that "6.4 per centum upon the Commission's valuation of $1,150,000 * * * is fair and reasonable under all the facts and circumstances of this case." But we are not here concerned with what the Commission in the exercise of its legislative discretion deems a fair and reasonable return. Upon a judicial review we are only concerned with this ultimate question, Are the rates prescribed confiscatory? In addition it must be borne in mind that its view as to what does and does not constitute from a legislative point of view a fair and reasonable return to the Company is predicated upon the valuation made by it of the Company's properties, which it, perhaps, recognized was cut to the bone.

The City's assignment of error, that the Commission erred in not prescribing lower rates than it did, raises a legislative and not a judicial question, and cannot be considered by us in this review. In so far as its assignments raise judicial questions they have been disposed of in what has been said.

Our ultimate conclusion is that the rates prescribed by the Commission in the order appealed from are rates which it had the legal right to prescribe, and have been legally prescribed; and its order will be affirmed.

*Affirmed.*

CAMPBELL, C. J., and GREGORY, J., concur in result.

GREGORY, J., concurring in the result.

I concur in the result reached in this case.

The constitutional question of judicial review is not raised here, and therefore it was not necessary to discuss it. This was practically conceded at the bar of this court. Counsel

for the parties in interest waived the question, and stated that they were not interested in it. All of the language used in the majority opinion regarding a *true* review and *judicial* review is outside of the case and *dicta*.

But, if the question were properly in this case, we would not be interested in what is termed a *true* review. The requirements of the Constitution of the United States are met when a *judicial* review is provided and not a *true* review. Judicial review simply means that, when a utility company claims in a rate case that its property is confiscated by the rate established, there must be some tribunal before which the utility company may have the question judicially determined upon an independent judgment both as to the law and the facts. *Ohio Valley Water Company* v. *Ben Avon Borough,* 253 U. S. 287, 64 L. Ed. 908, 40 S. Ct. 527.

This court should set aside an order of the Corporation Commission establishing a rate only when it appears that the Commission has exceeded its constitutional or statutory authority; or that its action has resulted from an unreasonable exercise of its authority; or that it is based upon a mistake of law; or is contrary to the evidence or without evidence to support it; or that the rate fixed is so low as to amount to confiscation and deprive the utility company of its property without due process of law.

In conclusion, there is no language in the *Aetna Case* which can fairly be construed as holding that the provisions of the Virginia Constitution, relating to transportation and transmission cases, are rendered invalid by the Constitution of the United States.